PILLSBURY WINTHROP SHAW PITTMAN LLP
BLAINE I. GREEN (SBN 193028)
blaine.green@pillsburylaw.com
DUSTIN CHASE-WOODS (SBN 318628)
dustin.chasewoods@pillsburylaw.com
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Telephone:        415.983.1000
Facsimile:        415.983.1200

LAWYERS' COMMITTEE FOR CIVIL RIGHTS
OF THE SAN FRANCISCO BAY AREA
BREE BERNWANGER (SBN 331731)
bbernwanger@lccrsf.org
VICTORIA PETTY (SBN 338689)
vpetty@lccrsf.org
131 Steuart Street #400
San Francisco, CA 94105
Telephone:    415.814.7631

Attorneys for Plaintiffs Eduardo I.T.; Edwin E.I.I.; Ignacio P.G.; Leonel Y.P.G., a minor child; Benjamin J.R.; and William A.J.M.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION**

| | |
|---|---|
| EDUARDO I.T., EDWIN E.I.I., IGNACIO P.G., LEONEL Y.P.G., A MINOR CHILD, BENJAMIN J.R., AND WILLIAM A.J.M.<br><br>　　　　Plaintiffs,<br><br>　　vs.<br><br>UNITED STATES OF AMERICA<br><br>　　　　Defendant. | Case No.<br><br>**COMPLAINT FOR DAMAGES UNDER THE FEDERAL TORT CLAIMS ACT**<br><br><br><br>**DEMAND FOR JURY TRIAL** |

# I.      INTRODUCTION

1.      This damages action seeks justice for three pairs of indigenous Guatemalan fathers and children ("Plaintiffs") who fled persecution to the United States to seek safety and asylum, only to meet more violence at the hands of the federal government. Over the course of at least three months in 2018, the United States adopted a policy of intentionally separating immigrant families for the express purpose of causing those families emotional harm ("Family Separation Policy" or "Policy"). The Family Separation Policy was focused on our nation's southern border, where a substantial portion of arriving immigrants are Latin Americans coming to the United States to seek asylum. While the Policy was in effect, U.S. officials systematically separated parents from their children using methods as diverse as they were appalling: ripping breastfeeding babies from the arms of their mothers,[1] spiriting away children in the middle of the night,[2] and luring them away under false pretenses.[3]

2.      Plaintiffs lived the nightmare of the Family Separation Policy. Shortly after each family's arrival into the United States, armed immigration officials snatched the children from their fathers. One father feared that his son had been murdered, because he could contemplate no other explanation for why armed men would take his weeping son away. The children, who were 6, 15, and 16 years old at the time, all feared that they would never see their fathers again. The government coupled this mental and emotional trauma with physical cruelty, caging the family members in putrid, crowded detention facilities without access to basic human needs. Immigration officials kept the Plaintiff fathers and children forcibly separated, and kept them in agonizing ignorance of the whereabouts, well-being, or fate of their family member. Nor could the fathers—who spoke only

---

[1] *See* Ed Lavandera, *She says federal officials took her daughter while she breastfed the child in a detention center*, CNN (June 14, 2018), available at https://www.cnn.com/2018/06/12/us/immigration-separated-children-southern-border/index.html.

[2] *See Ms. L. v. U.S Immigration & Customs Enf't*, Case No. 3:18-cv-00528-DMS-MDD, Dkt. 456 at 12 (S.D. Cal. Sept. 4, 2019) ("When B.L.S.P. and her son entered immigration detention on November 20, 2017, they were separated, and the following day B.L.S.P. awoke and found 'her son was gone.'").

[3] *See* Valerie Edwards, *Caged and separated: Photos show inside a Texas processing center where children are taken from their parents by border agents 'tell them they are just going for a bath'*, Daily Mail (June 17, 2018), available at https://www.dailymail.co.uk/news/article-5854987/Illegal-immigrant-parents-told-children-going-bath-theyre-separated.html.

indigenous Guatemalan languages—adequately convey their desperate questions to government officers because, having never been provided a translator, they were kept in linguistic isolation throughout their detention. Plaintiffs suffered extreme emotional distress upon forcible separation, during the weeks and months of sustained separation that followed, and continued to experience lasting psychological and emotional trauma even after they were reunified. This suffering was the stated purpose of the Family Separation Policy.

3.      The policymakers who created and directed the implementation of the Family Separation Policy sought to leverage the trauma of Plaintiffs, and other migrant families, to deter immigration, believing that inhumane treatment would force asylum-seekers to give up on their asylum applications and agree to be deported from the United States. These policymakers articulated this vision for U.S. policy while they developed the Family Separation Policy, even though the right to apply for asylum is codified and protected by statute. The policymakers also sought to generate media coverage of the Policy and its effects, including the emotional pain caused by the Policy, believing that international media coverage of the Family Separation Policy would deter potential immigrants from seeking asylum in the United States.

4.      Thanks to public outrage and court intervention,[4] the Family Separation Policy is no longer in effect. But Plaintiffs' lives, along with the lives of thousands of migrants, were changed forever. Plaintiffs sought redress for the harms that they suffered by timely filing administrative claims under the Federal Tort Claims Act ("FTCA") with the federal agencies that perpetrated the grievous harms detailed herein. Those agencies have ignored those claims and have pursued case-by-case litigation, despite a string of decisions denying the government's motions to dismiss similar claims. *See, e.g., P.G. v. United States*, No. 4:21-cv-04457-KAW, 2022 WL 3024319 (N.D. Cal. May 10, 2022) (denying motion to dismiss and collecting cases); *see also A.E.S.E. et al. v. United States et al.*, No. 21-cv-0569 RB-GBW, 2022 WL 4289930 (D. N.M. Sept. 16, 2022); *F.R. v. United States*, No. CV-21-00339-PHX-DLR, 2022 WL 2905040 (D. Ariz. July 22, 2022); *A.F.P. v. United States*, No. 121CV00780DADEPG, 2022 WL 2704570, at *19 (E.D. Cal. July 12, 2022). The

_____

[4] *Ms. L. v. U.S Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018).

COMPLAINT
Case No:

government's ongoing strategic intransigence evidently derives from a calculation that it is more politically expedient to waste court, attorney, litigant, and agency time and resources repeatedly raising meritless threshold defenses than to work toward fair recompense for the undeniable damage wrought by the Family Separation Policy. This approach contravenes the Federal Tort Claims Act's purpose of encouraging settlements in lieu of resource-intensive litigation. *Cf.* Comm. on the Judiciary, Increased Agency Consideration of Tort Claims Against the Government, S. Rep. No. 89-1327, at 2-4 (2d Sess. 1966), as reprinted in 1966 U.S.C.C.A.N. 2515, 2516-18 (explaining notice of claim procedure was intended to reduce court congestion and avoid litigation costs and resources by encouraging settlements). The government's obstinacy prolongs a disgraceful chapter in this nation's history and leaves Plaintiffs with no option but to seek justice from this Court.

## II.      JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

5.      JURISDICTION. This Court has subject matter jurisdiction under 28 U.S.C. § 1346(b)(1). Plaintiffs bring this suit under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671 *et seq*. The FTCA has an exhaustion requirement under which a claimant, before filing suit, must tender an administrative claim to the relevant federal agency. If the agency does not finally dispose of the administrative claim within six months, then the claimant is deemed to have exhausted administrative remedies. 28 U.S.C. § 2675(a). All Plaintiffs filed administrative claims with the relevant federal agencies more than six months ago, and the agencies did not finally dispose of Plaintiffs' claims.

6.      VENUE. Because Plaintiffs reside in this District, venue is proper under 28 U.S.C. § 1402(b). Venue is proper in this District under 28 U.S.C. § 1391(e)(1) for the additional reason that a substantial part of the events giving rise to this claim occurred within this District.

7.      DIVISIONAL ASSIGNMENT. This action is properly assigned to the San Francisco/Oakland Division pursuant to Civil Local Rule 3-2(c) and General Order 44(D)(1) because this action arises in Alameda County and because FTCA cases are not exempt from intradistrict assignment.

## III.      PARTIES

8.      Plaintiff Eduardo I.T. resides in Oakland, California with his son, Plaintiff Edwin

E.I.I.[5] Eduardo and Edwin are indigenous Maya Q'eqchi' people from Guatemala. When federal officials separated Edwin from his father, Edwin was 16 years old. Eduardo has a pending application for asylum. His asylum interview took place on April 26, 2021, but the Asylum Office has not yet adjudicated his claim. In addition to being able to derive asylum status if his father's asylum application is granted, Edwin has Special Immigrant Juvenile status and a pending application for lawful permanent residence. Both Eduardo and Edwin also have pending applications for parole-in-place, which if granted, would give them lawful status in the United States for at least three years.

9.      Plaintiff Ignacio P.G. resides in Oakland, California with his minor son, Plaintiff Leonel Y.P.G. Ignacio and Leonel are indigenous Maya Mam people from Guatemala. When federal officials separated Leonel from his father, Leonel was six years old. Ignacio brings this action on his own behalf and, independently, on his son's behalf as his next friend. The government has placed Ignacio in removal proceedings in immigration court, where he has a pending application for asylum. If Ignacio's application is successful, Leonel will be eligible to seek derivative asylum status.

10.      Plaintiff Benjamin J.R. resides in Oakland, California with his son, Plaintiff William A.J.M. Benjamin and William are indigenous Maya Mam people from Guatemala. When federal officials separated William from his father, William was 15 years old. Benjamin has a pending application for asylum, on which William is a derivative. William also has been granted Special Immigrant Juvenile status.

11.      Defendant the United States of America is the appropriate defendant under the FTCA. 28 U.S.C. § 1346(b). Defendant acted through the Department of Homeland Security ("DHS"), the Department of Health and Human Services ("HHS"), United States Citizenship and Immigration Services ("USCIS"), and the Department of Justice ("DOJ")—all "federal agencies" of the United States under 28 U.S.C. § 2671—and their employees, officers, and agents, including but not limited

---

[5] Plaintiffs Eduardo I.T., Ignacio P.G., and Benjamin J.R. are collectively referred to herein as "Plaintiff Parents." Plaintiffs Edwin E.I.I., Leonel Y.P.G., and William A.J.M. are collectively referred to herein as "Plaintiff Children." Plaintiffs are concurrently filing a motion to proceed under pseudonyms.

COMPLAINT
Case No:

to Customs and Border Protection ("CBP") and Immigration and Customs Enforcement ("ICE"), subcomponent agencies of DHS that are under the direction, authority, and control of the Secretary of Homeland Security; the Office of Refugee Resettlement ("ORR"), a subcomponent agency of HHS that is under the direction, authority, and control of the Secretary of Health and Human Services; and the Office of the Attorney General within the DOJ.

12.    The federal officers referenced in this Complaint were at all relevant times employees of the United States, working within the scope and course of their employment with the federal agencies listed above.

13.    DHS employees were responsible for separating Plaintiff parents from their children. DHS employees were also responsible for supervising and managing detained individuals at CBP and ICE facilities, including the facilities where the Plaintiff families were detained.

14.    HHS employees are responsible for supervising and managing the detention of children the government classifies as "unaccompanied," including at facilities where Plaintiff Children were detained while separated from their parents.

15.    High-ranking officials from DHS, HHS, and DOJ worked together to design and promulgate the unlawful and unconstitutional Family Separation Policy, pursuant to which Plaintiffs were subject to significant harm.

IV.    FACTUAL ALLEGATIONS

A.    **The United States developed the Family Separation Policy to traumatize Central American asylum seekers into giving up their claims and accepting deportation, and to deter future asylum claims.**

16.    No statute or regulation required the government to separate Plaintiffs. To the contrary, the Family Separation Policy was an executive policy purposefully designed to traumatize, demoralize, and deter people from seeking asylum under the laws of this country.

17.    Federal law guarantees non-citizens on U.S. soil or at ports of entry the right to seek asylum and related humanitarian protections, regardless of how, where, or with whom they arrive at the U.S. border or crossed into the country. *See* 8 U.S.C. § 1158(a)(1) (asylum); 8 U.S.C. § 1231(b)(3) (withholding of removal); 8 C.F.R. § 208.1 (protection under the Convention Against Torture). The asylum statute, codified in the Refugee Act of 1980, reflects "one of the oldest themes

-6-

in America's history—welcoming homeless refugees to our shores," and "gives statutory meaning to our national commitment to human rights and humanitarian concerns." Sen. Rep. No. 256, 96th Cong., 1st Sess. 1 (1979), reprinted in U.S. Code Cong. and Admin. News 141, 141.

18.     At the time Plaintiffs entered the United States, asylum law provided two paths when immigration officials apprehended an individual who entered without lawful permission or documentation, but indicated an intention to seek asylum or a fear of persecution or torture in their home country. First, officials could place the asylum-seeker directly into removal proceedings in immigration court through the issuance of a Notice to Appear for a future hearing date. *See* 8 U.S.C. §§ 1225(b)(2), 1229(a). In removal proceedings in immigration court, the asylum-seeker could file an application for asylum and other forms of relief, and litigate the claims before an immigration judge. Alternatively, immigration officials could refer the individual to an interview with an asylum officer to determine whether the individual had a credible fear of persecution if returned to his or her country of origin (a "credible fear interview"). If the individual received a positive credible fear finding (i.e. established a significant possibility that they could qualify for asylum) they would be placed into removal proceedings, where they could file an application for asylum or other relief, just as they could have if immigration officials had routed them to immigration court in the first place. 8 U.S.C. § 1225 (b)(1)(B)(ii); 8 C.F.R. § 208.30(e); 8 C.F.R. §§ 235.6(a)(1)(ii), (iii). [6] There is no law requiring the detention of asylum seekers or the prolonged separation of families. [7]

19.     In 2017, over 35 years after the Refugee Act became law, Donald Trump became the President. President Trump promised, before and after his election, to enact policies designed to prevent and deter people from seeking asylum in the United States. It was "his signature campaign

---

[6] If the asylum officer conducting the credible fear interview found that the asylum-seeker did not meet the credible fear standard, the asylum-seeker could seek review of the decision before an immigration judge in a limited-scope proceeding. If the immigration judge affirmed the denial, the asylum-seeker could then request reconsideration of the decision at the Asylum Office. If the Asylum Office declined to reconsider or reaffirmed the negative finding, the asylum seeker would be subject to a final order of expedited removal and could be deported.

[7] In March 2022, the Biden Administration issued an Interim Final Rule modifying asylum procedure, but none of the changes required or suggested the separation of families. *See generally* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 Fed. Reg. 18078 (Mar. 29, 2022).

issue."[8] Throughout his presidency, President Trump continued his full-throated advocacy of sealing this nation's borders to immigrants seeking protection from persecution, declaring, "When people, with or without children, enter our Country, they must be told to leave without our Country being forced to endure a long and costly trial"—by which the President meant the statutorily-protected right to apply for asylum, an administrative proceeding. The President continued, "Tell the people 'OUT,' and they must leave, just as they would if they were standing on your front lawn."[9] He also separately declared: "We cannot allow all of these people to invade our country."[10]

20.     Within a few weeks of President Trump's inauguration, government officials from various agencies began considering a new, unprecedented initiative to separate children from their parents at the border in order to cause asylum seekers such extreme emotional distress that they would abandon their claims. Government officials were aware at the time that separation caused trauma for both adults and children, based at least in part on DHS' own prior reports.

21.     A September 30, 2016, DHS Advisory Committee report noted that even very brief "[s]eparation can be acutely frightening for children, and can leave children in ad hoc care situations that compromise their safety and well-being. It can also be traumatizing and extremely stressful for the parent who is dealing with the underlying situation but also possible feelings of guilt and worry

---

[8] Mimi Dwyer, *Factbox: How Trump followed through on his immigration campaign promises*, Reuters (Aug. 14, 2020), available at https://www.reuters.com/article/us-usa-immigration-election-factboxhow-trump-followed-through-on-his-immigration-campaign-promises-idUSKCN25A18U; *see also* Erika Guevara Rosas, *Rebuilding from the ashes, Trump's heritage on immigration and asylum policy*, Amnesty International (Nov. 26, 2020), available at https://www.amnesty.org/en/latest/news/2020/11/trumps-heritage-immigration-asylum-policy/ ("One of the Trump administration's flagship issues, since his 2016 presidential campaign, has been migration and asylum."); Jeff Sessions, *Remarks to the Executive Office for Immigration Review* (Oct. 12, 2017), available at https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-executive-office-immigration-review.
[9] Emma Platoff, Alexa Ura, Jolie McCullough & Darla Cameron, *While Migrant Families Seek Shelter From Violence, Trump Administration Narrows Path to Asylum*, Texas Tribune (July 10, 2018), available at https://www.texastribune.org/2018/07/10/migrant-families-separated-border-crisis-asylum-seekers-donald-trump/
[10] Brent D. Griffiths, *Trump: 'We cannot allow all of these people to invade our country'*, Politico (June 24, 2018), available at https://www.politico.com/story/2018/06/24/trump-invade-country-immigrants-667191.

for their child."[11]

22.     And Leon Fresco, a DOJ official in the Obama Administration, has stated that the government had previously considered, but ultimately rejected, Family Separation policies because "it was too detrimental to the safety of the children to separate them from their parents."[12]

23.     Unsurprisingly, given the well-documented harm that family separation causes, longstanding federal border policy that had spanned successive presidential administrations and that was still in place at the time of President Trump's inauguration had prioritized keeping families together. With the specific purpose of preserving family unity, DOJ had for years generally declined to refer parents migrating with children for prosecution of immigration-related offenses.[13] Similarly, DHS had a longstanding policy of keeping arriving immigrant families together.[14]

24.     In a town hall meeting held on February 2, 2017—less than two weeks after President Trump's inauguration—John Lafferty, the head of the Asylum Office at U.S. Citizenship and Immigration Services, an agency within DHS, held an inter-governmental "town hall" meeting to describe policy proposals designed to lower the number of asylum applications in the United States by deterring asylum seekers from pursuing their claims. One such proposal that Lafferty described as under review was a new policy that would separate parents from their children.[15]

25.     In early March 2017, then-Secretary of Homeland Security John Kelly confirmed that the United States was evaluating whether to implement a Family Separation policy, stating that he

---

[11] Report of the DHS Advisory Committee on Family Residential Centers (Sept. 30 2016), https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf.

[12] Daniella Diaz, *Kelly: DHS is considering separating undocumented children from their parents at the border*, CNN (Mar. 7, 2017), https://perma.cc/L4Q9-KVAW.

[13] *See* U.S. Dep't of Justice Office of the Inspector General, "Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services" at 2, available at https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf.

[14] *See* U.S. Dep't of Justice Office of the Inspector General, "Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services" at 2, available at https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf.

[15] Julia Ainsley, *Trump admin discussed separating moms, kids to deter asylum seekers in Feb. 2017*, NBC News (June 18, 2018), https://www.nbcnews.com/politics/immigration/trump-admin-discussed-separating-moms-kids-deter-asylum-seekers-feb-n884371.

COMPLAINT
Case No:

was "considering [doing so] in order to deter more movement along [the border]."[16] Other DHS officials provided similar confirmations. An email sent by the Assistant DHS Secretary for International Affairs the next day revealed that "the 'separating families' issues" had been discussed at the Department's "morning huddle."[17] And, around the same time, DHS officials were reporting that the Department was considering a proposal to separate families entering the United States in order to deter parents from migrating with their children.[18]

1.      **In 2017, the government piloted a secret Family Separation Policy in El Paso, resulting in the long-term separation of hundreds of families.**

26.     The United States piloted a formal Family Separation policy in the U.S. Border Patrol's El Paso Sector from March through November 2017 (the "Pilot Program"). Through the Pilot Program, federal immigration officials began separating families arriving in that discrete region to pressure migrant parents into foregoing their asylum claims and accepting deportation. The Pilot Program also sought to leverage the fear that immigrant parents might be separated from their children to deter migrants from seeking to enter the United States in El Paso.

27.     The Pilot Program represented a deviation from the government's prior policy of not prosecuting adults traveling with minor children. As a Border Patrol official explained to Jim Tierney, then the acting U.S. Attorney for the District of New Mexico, "it is the hope that this separation will act as a deterrent to parents bringing their children into the harsh circumstances that are present when trying to enter the United States illegally. . . It is expected that once immigrants become aware that there is a higher probability of being prosecuted and separated if apprehended in Texas, the traffic will move to the areas surrounding the New Mexico Stations."[19] Put differently, the Pilot Program sought to assess whether family separation would deter migration.

28.     The Pilot Program required coordination between immigration officials and the U.S.

---

[16] United States House of Representatives Committee on the Judiciary, Majority Staff Report, *The Trump Administration's Family Separation Policy: Trauma, Destruction, and Chaos* (October 2020) at 6.
[17] *Id.*
[18] Julia Edwards Ainsley, *Exclusive: Trump Administration Considering Separating Women, Children at Mexico Border*, Reuters (Mar. 3, 2017), https://perma.cc/P7DE-HX5A.
[19] OIG at 14, n.30.

COMPLAINT
Case No:

Attorney's Office.

29.     Breaking from the prior practice described above, U.S. Border Patrol officials who apprehended migrating families began referring parents for criminal prosecution of misdemeanor border crossing charges in order to separate them from their children.

30.     The immigration officials then exploited a provision of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), a statute meant to protect children who arrive in the United States without a parent, to pretextually justify seizing long-term custody of the child *from the child's parent*. The TVPRA defines an "unaccompanied alien child" ("UAC") as a child who is under 18, lacks lawful immigration status, and for whom "there is no parent or legal guardian in the United States or no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2). Under the Pilot Program—and later, under the border-wide Family Separation Policy—immigration officials separated children from the parents who accompanied them (and were available to provide physical care and custody) in order to classify them as "UACs" and detain them separately from their parents. When immigration officials designate a child in their custody as a UAC, the TVPRA requires that custody of the child transfer to HHS. As part of the Pilot Program, after separating a child from their accompanying arriving parent, immigration officials classified the child as a UAC and whisked him or her off to HHS, and specifically ORR, which maintains child-welfare facilities throughout the country, even though the government knew the precise location of the child's parent.

31.     During the Pilot Program, DHS officials generally transferred separated parents to U.S. Marshals Service for prosecution under 8 U.S.C. § 1325, a misdemeanor border crossing offense. Soon thereafter, the parent was transferred back to civil immigration custody. Meanwhile, the child remained detained in civil immigration custody by HHS, separated from his or her parent.[20] The Pilot Program did not contemplate or provide for the reunification of separated families at any point.

32.     Ultimately, the Pilot Program resulted in the separation of at least 280 different

---

[20] *See generally* OIG at 13-17.

families, some of whom included breast feeding mothers and their infants. The government did not

implement any mechanisms to track separations within government systems, much less to allow

separated parents and children to locate one another. As a result, the government did not keep track

of the families it had separated, and parents and children were detained incommunicado from one

another and with no information about the other's location, let alone well-being.[21]

### 2. In the aftermath of the Pilot Program, high-level policymakers received repeated confirmation that separation harmed parents and children.

33.     The Pilot Program prompted immediate backlash from prosecutors, judges, and other

stakeholders in the area.[22] In response to the policy, John Bash, then Acting U.S. Attorney for the

Western District of Texas, remarked, "History would not judge [prosecuting family units] kindly."[23]

Magistrate Judge Miguel Torres of the Western District of Texas presided over many of the resulting

criminal prosecutions and documented that criminal defense attorneys and defendants had

"repeatedly" voiced concerns "regarding their limited and often non-existent lack of information

about the wellbeing and whereabouts of their minor children from whom they were separated at the

time of their arrest."[24]

34.     High-ranking DOJ officials understood the severe emotional damage the Pilot

Program inflicted on separated parents and children. As documented by the DOJ's Inspector

General, U.S. Attorney Bash briefed high-ranking policymakers within DOJ, including Counselor to

the Attorney General Gene Hamilton, about the Pilot Program, including specific references to Judge

Torres's concerns that the government had implemented the program in a way that made it

impossible for families to reunify.

35.     Predictably, as the extremely harmful effects of the Pilot Program became apparent

over the course of the program's existence from 2017 to 2018, DHS began receiving scores of

complaints through its Office of Civil Rights and Civil Liberties ("CRCL"), many of which

---

[21] Department of Justice, Office of the Inspector General, Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services (January 2021) at 15-17).
[22] *Id.* at ii, 15-17.
[23] *Id.* at 14.
[24] *Id.* at 17.

described the extreme trauma that separation caused adults and children, and which highlighted the "needless cruelty" of the separations.[25]

36.     Officials inside and outside of the government continued to voice concerns about the harmful effects of the Pilot Program even after it was terminated in 2018. In fact, following the Pilot Program's termination, some government officials publicly disavowed it because of the chaos and suffering it caused. For example, following the briefing that he provided to DOJ policymakers, Acting U.S. Attorney Bash thought "the idea [had been] abandoned" and would not be implemented nationwide.[26]

37.     In March 2018, United States Public Health Service Commissioned Corps Commander Jonathan White, who was then detailed to HHS as the Coordinating Official and Incident Commander for Unaccompanied Alien Children Program, expressed to senior ORR leadership that a Family Separation policy would "be inconsistent with our legal requirement to act in the best interest of the child."[27]

38.     Also, in March 2018, the American Academy of Pediatrics ("AAP"), upon learning that the administration was considering a border-wide Family Separation Policy, wrote directly to DHS six times. AAP also issued multiple public statements noting that "family separation devastates the most basic human relationship we know, that of parent and child."[28]

39.     As a result, high-level policymakers knew from expert advice and from the

---

[25] House Report at 10; *see also* Appendix A (chart of 860 CRCL complaints, including over 150 that preceded the May 2018 implementation of the Family Separation Policy border-wide).
[26] OIG at 19.
[27] Commander White provided this as sworn testimony. Testimony of Commander Jonathan White, United States Public Health Service Commissioned Corps, Hearing Before the House of Representatives Subcommittee on Oversight and Investigations, *Examining the Failures of the Trump Administration's Inhumane Family Separation Policy* (February 7, 2019) at 1114-138, 1514-519, 2363-367, available at https://docs.house.gov/meetings/IF/IF02/20190207/108846/HHRG-116-IF02-Transcript-20190207-U1.pdf.
[28] Testimony of Dr. Julie Linton, Co-Chair of the American Academy of Pediatrics Immigrant Health Special Interest Group, Hearing Before the House of Representatives Subcommittee on Oversight and Investigations, *Examining the Failures of the Trump Administration's Inhumane Family Separation Policy* (February 7, 2019) at 3220-235, available at https://docs.house.gov/meetings/IF/IF02/20190207/108846/HHRG-116-IF02-Transcript-20190207-U1.pdf.

-13-

experience of the Pilot Program that separating migrant children from their parents would cause extreme emotional pain and suffering. It is precisely why high-level policymakers adopted the Pilot Program border-wide later in 2018.

> **3.      The United States began forcibly separating families border-wide on April 6, 2018 in order to cause parents and children severe emotional distress, to coerce them into abandoning their asylum claims, and to deter future asylum seekers.**

40.     With full knowledge of the grievous harm the Pilot Program inflicted on migrant families, the U.S. government continued weighing policy proposals that would purposefully separate migrant families along at the border. These proposals would ultimately culminate in the Family Separation Policy.

41.     In August 2017, a group of DHS officials drafted memos outlining a further range of policies designed to reduce the number of people entering the United States to apply for asylum. One of the proposals involved separating parents from their children at the border.[29]

42.     Similarly, in an email dated December 11, 2017, Thomas Blank, the Chief of Staff of ICE, described how the agency had been asked to take the lead on drafting a decision memo regarding "separating Family Units."[30]

43.     An inter-agency memo dated December 16, 2017 and entitled "Policy Options to Respond to Border Surge of Illegal Immigrants" was circulated between high-level officials at DHS and DOJ.[31] Among other things, the memo recommended that the government adopt many of the same processes that had defined the Pilot Program, including "separating family units, placing . . . adults in adult detention, and placing . . . minors . . . in the custody of HHS as unaccompanied alien children." The memo further recommended that "[Border Patrol] and ICE . . . work with DOJ to significantly increase the prosecution of family unit parents when they are encountered at the

---

[29] J. Blitzer, *How the Trump Administration Got Comfortable Separating Immigrant Kids from their Parents*, The New Yorker, May 30, 2018, available at https://www.newyorker.com/news-desk/how-the-trump-administration-got-comfortable-separating-immigrant-kids-from-their-parents.
[30] American Oversight, *A timeline of the Trump Administration's family separation policy* (last accessed February 25, 2021), available at https://www.americanoversight.org/a-timeline-of-the-trump-administrations-Family Separation-policy.
[31] *Id.*

COMPLAINT
Case No:

border." As a result, "parents would be prosecuted for illegal entry . . . or illegal reentry . . . and the minors present with them would be placed in HHS custody." The memo specifically contemplated that "the increase in prosecutions would be reported by the media and it would have a substantial deterrent effect."[32]

44. Notwithstanding the well-documented harm the Pilot Program had caused and the knowledge that additional separations would cause separated children and their parents severe emotional harm, the United States formally unveiled the Family Separation Policy on April 6, 2018, in a memo from Attorney General Jeff Sessions titled "Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a)."[33] Effectively adopting the Pilot Program border-wide,[34] the Zero-Tolerance Policy targeted parents crossing the border for prosecution and used that prosecution as a pretext for designating their children as "unaccompanied" (UACs) so that the children could be sent to, and detained in, HHS facilities far away from where their parents were being held.

45. Government officials repeatedly acknowledged that the actual goal of the so-called "Zero Tolerance" policy was separating families.

46. Shortly after implementing the policy, Attorney General Sessions, ignoring that most arriving parents come to the United States with their own children, stated: "If you smuggle illegal aliens across our border, then we will prosecute you. If you are smuggling a child, then we will prosecute you and that child will be separated from you as required by law."[35]

47. On May 11, 2018, Sessions stated his goal even more clearly. During a conference call with the five U.S. Attorneys responsible for the jurisdictions at the southwest border, he declared, "*we need to take away children*."[36]

48. When subsequently asked during an interview on Fox News whether family

---

[32] *See* Policy Options to Respond to Border Surge of Illegal Immigration, at 1, available at https://perma.cc/7KRZ-PXW7.
[33] Office of the Attorney General, Memorandum for Federal Prosecutions Along the Southwest Border (Apr. 6, 2018).
[34] OIG report at 19, 30.
[35] Department of Justice, Office of the Inspector General, *Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services* (January 2021) at 1.
[36] *Id.* at 39 (emphasis added).

-15-

separations were being used as a deterrent, Sessions responded, "yes, hopefully people will get the message."[37]

49.     Around that same time, John Kelly, by then the White House Chief of Staff, was asked why the United States was separating families from their children. He responded that "a big name of the game is deterrence" and that family separation "could be a tough deterrent—would be a tough deterrent."[38]

50.     The acting Assistant Secretary for HHS also explained that he expected the fear of separation would discourage families from migrating: "We expect that the new policy will result in a deterrence effect, we certainly hope that parents stop bringing their kids on this dangerous journey and entering the country illegally."[39]

51.     In directing the implementation of the Family Separation Policy, the government specifically targeted families for prosecution so that it could generate a pretext for separating them.[40] Among other things, Attorney General Sessions specifically directed U.S. Attorneys in jurisdictions along the southwest border to focus prosecution efforts on families that had been apprehended after crossing the border.[41]

52.     However, the scope of the Family Separation Policy extended far beyond the scope of the Zero-Tolerance prosecution policy that served as its pretext. Federal agents did not limit separations to parents being prosecuted for illegal entry; they also forcibly separated children from parents who were not prosecuted, such as Plaintiff Parents, and kept them separated for months. In fact, more than 15 percent of all adults separated from children as part of the Family Separation

---

[37] Philip Bump, *Here Are the Administration Officials Who Have Said that Family Separation Is Meant as a Deterrent*, Washington Post, June 19, 2018, https://perma.cc/LTB8-878Y.
[38] Transcript: *White House Chief of Staff John Kelly's Interview with NPR*, NPR (May 11, 2018), https://perma.cc/ZN5N-VN5R.
[39] Philip Bump, *Here Are the Administration Officials Who Have Said that Family Separation Is Meant as a Deterrent*, Washington Post, June 19, 2018, https://perma.cc/LTB8-878Y.
[40] Report of Syracuse University TRAC program, "'Zero Tolerance' at the Border: Rhetoric vs. Reality" (24 July 2018): https://trac.syr.edu/immigration/reports/520/
[41] Department of Justice, Office of the Inspector General, *Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services* (January 2021) at 34-35, 24.

Policy, including Plaintiffs, were **not** referred for prosecution.[42]

53.   The United States even separated migrant parents from their children when the families followed the government's express instructions regarding how to enter the United States and apply for asylum. The government directed asylum applicants to enter the United States through official ports of entry to make their applications, and assured them that, by doing so, they could avoid any risk of separation. For example, Secretary of Homeland Security Kirstjen Nielsen stated "DHS is not separating families legitimately seeking asylum at ports of entry. If an adult enters at a port of entry and claims asylum, they will not face prosecution for illegal entry. They have not committed a crime by coming to the port of entry."[43] And then-Attorney General Sessions made similar statements, noting that asylum applicants should "come through the border at the port of entry."[44]

54.   Despite these promises and directions, however, the United States separated at least 60 asylum-seeking families at ports of entry between May and June of 2018.[45] The children separated were as young as 5 months old and were separated from their families for at least four weeks, and some for more than a year.[46]

55.   Even where parents were prosecuted, the cruelty and duration of the separation remained unexplained by any stated government justification. In many instances, for example, parents whose criminal proceedings lasted only a day would return to custody to find their children missing and would remain separated for weeks or months with no information about their children's whereabouts or well-being.[47] In other instances, government officials purposefully arranged to have

---

[42] Department of Homeland Security, Office of the Inspector General, *DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families* (November 25, 2019) at 33.
[43] Press Briefing by Press Secretary Sarah Sanders and DHS Secretary Kirstjen Nielsen, June 18, 2018, https://www.whitehouse.gov/briefings-statements/press-briefingpress-secretary-sarah-sanders-department-homeland-security-secretary-kirstjen-nielsen061818/.
[44] The Ingraham Angle (Fox News television broadcast Jun. 18, 2018), available at https://video.foxnews.com/v/5799065216001/#sp=show-clips.
[45] Department of Homeland Security, Office of the Inspector General, *CBP Separated More Asylum-Seeking Families at Ports of Entry Than Reported for Reasons Other Than Those Outlined in Public Statements* (May 29, 2020) at 2.
[46] *Id.* at 8.
[47] Testimony of Jennifer Nagda, Policy Director at the Young Center for Immigrant Children's Rights, Hearing Before the House of Representatives Committee on Oversight and Reform, Serial

-17-

parents transferred to entirely different facilities after their prosecutions had ended so that they could not be reunited with their children, reportedly because CBP officials wanted to avoid doing paperwork.[48]

56.     Prolonged—even permanent—separation was part of the Family Separation Policy's intentional design. Policymakers intentionally refused to take steps that would facilitate reunification after separation. Based on their experience with the Pilot Program, policymakers knew that the relevant government agencies' failure to record and track separations and family relationships made it impossible to identify parent-child relationships and reunify families.[49] Officials had been directly notified of these deficiencies before implementing the Family Separation Policy.[50] Some agency officials warned that it would not be possible to track and identify separated families even within Border Patrol's system—let alone between different agencies. However, other "key stakeholders" urged the government to roll out the Family Separation Policy before these identified deficiencies had been resolved.[51] The United States chose to implement the Family Separation Policy despite knowing it had no system in place to track and reunify separated families.

57.     The barbarity of the Family Separation Policy provoked a loud and righteous public outcry, including litigation. In the lead case, *Ms. L. v. U.S. Immigration and Customs Enforcement*, Judge Sabraw of the Southern District of California denied the Trump Administration's motion to dismiss the plaintiff class's challenge to the Policy on June 6, 2018, holding:

> [plaintiffs'] allegations sufficiently describe government conduct that arbitrarily tears at the sacred bond between parent and child, and is emblematic of the exercise of power without any reasonable justification in the service of an otherwise legitimate governmental objective. Such conduct, if true, as it is assumed to be on the present motion, is brutal, offensive, and fails to comport with traditional notions of fair play and decency. At a minimum, the facts alleged are sufficient to show the

---

No. 116-46 (July 12, 2019) at 32,
https://docs.house.gov/meetings/GO/GO00/20190712/109772/HHRG-116-GO00-Transcript-20190712-U10.pdf
[48] Department of Homeland Security, Office of the Inspector General, *Special Review - Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy* (September 27, 2018) at 15.
[49] Department of Homeland Security, Office of the Inspector General, *DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families* (November 25, 2019) at Highlights.
[50] *Id.* at 15.
[51] *Id.* at 18-19.

government conduct at issue "shocks the conscience" and violates Plaintiffs' constitutional right to family integrity.[52]

58.     Under public and judicial pressure, President Trump revoked the government's Family Separation Policy by Executive Order. His June 20, 2018 order directed that DHS "shall, to the extent permitted by law and subject to the availability of appropriations, maintain custody of alien families during the pendency of any criminal improper entry or immigration proceedings involving their members."[53] In doing so, President Trump confirmed that the Family Separation Policy's goal had been to leverage the harm of separation to scare asylum seekers from seeking refuge in the United States. After terminating the Policy, President Trump participated in an interview on Fox News, where he bemoaned: "Now you don't get separated, and while that sounds nice and all, what happens is you have literally you have ten times as many families coming up because they're not going to be separated from their children . . . It's a disaster."[54] During the interview, President Trump affirmed that the practice of separating families was intended as a "disincentive" for entering the country,[55] and reiterated so during a later press conference, stating, "If [asylum applicants] feel there will be separation, they don't come."[56]

59.     Six days after the Family Separation Policy was officially terminated, Judge Sabraw certified the *Ms. L.* class and preliminarily enjoined the Family Separation Policy.[57] Holding that "the record in this case reflects that the separations at issue have been agonizing for the parents who

---

[52] *Ms. L. v. U.S Immigration & Customs Enf't*, 302 F. Supp. 3d 1149, 1167 (S.D. Cal. 2018) (internal quotation marks, citations, and alterations omitted).
[53] Affording Congress an Opportunity to Address Family Separation, Exec. Order No. 13,841,83 Fed. Reg. 29,435 § 1 (June 20, 2018).
[54] Kimberly Kindy, Nick Miroff & Maria Sacchetti, *Trump Says Ending Family Separation Practice Was a "Disaster" That Led to Surge in Border Crossings*, Washington Post, Apr. 28, 2019, https://www.washingtonpost.com/politics/trump-says-ending-Family Separation-practice-was-a-disaster-that-led-to-surge-in-border-crossings/2019/04/28/73e9da14-69c8-11e9-a66d-a82d3f3d96d5_story.html
[55] *Id.*
[56] David Shepardson, *Trump says family separations deter illegal immigrations*, Reuters (Oct. 13, 2018), https://www.reuters.com/article/us-usa-immigration-trump/trump-says-Family Separations-deter-illegal-immigration-idUSKCN1MO00C
[57] 310 F. Supp. 3d 1133 (S.D. Cal. 2018) (preliminary injunction); 331 F.R.D. 529 (S.D. Cal. 2018) (class certified).

have endured them," Judge Sabraw held that the plaintiffs were likely to succeed on the merits because the Policy violated their longstanding constitutional right to family integrity, and Judge Sabraw ordered the government to reunify the families who had been separated as a result of government conduct.[58]

60.    But damage had already been done. During the three months when the Family Separation Policy was in effect border-wide, the United States forcibly separated at least 5,648 children from their parents, according to the most recently reported data in the *Ms. L* litigation— including Plaintiffs William A.J.M., Leonel Y.P.G., and Edwin I.I.[59] Moreover, it quickly became clear that the government could not readily comply with the injunction requiring reunification. Because the goal of the Family Separation Policy had been to separate—and not reunify—families, the government had taken no steps to ensure there were systems in place to track separated family members so as to reunite them, even after the Pilot Program revealed that the consequences of failing to maintain such systems included prolonged and potentially permanent separation (such as through the deportation of a parent without their children).[60]

61.    Because the government adopted the Family Separation Policy without any plan regarding how to reunify separated family members—or even a check-box in the information technology systems for relevant government agencies indicating a family had been separated, and a link between the parent and child's records—officials undertook various ad hoc methods to record and track family separations while the Policy was in effect.[61] Predictably, these ad hoc methods led to widespread errors, for which government officials subsequently expressed "embarrassment."[62] Judge Sabraw was pointed in his criticism of the government's lack of planning, finding in the *Ms.*

---

[58] 310 F. Supp. 3d at 1146, 1149.

[59] *Ms. L*, No. 3:18-cv-428, Decl. of Marc Rosenblum (Sept. 22, 2021), appended to Joint Status Rep., ECF No. 616.

[60] U.S. Dep't of Homeland Sec., Off. of Inspector Gen., OIG-18-84, *Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy* 1 (Sept. 27, 2018) ("*DHS OIG Rep. 9/18*"), available at https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf at 9-10.

[61] Department of Homeland Security, Office of the Inspector General, *DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families* (November 25, 2019) at Highlights.

[62] *Id.* at 12.

*L.* preliminary injunction that the "unfortunate reality is that under the present system migrant children are not accounted for with the same efficiency and accuracy as *property*."[63] Indeed, the government did not implement any formal systems to track separated families until months ***after*** issuing the Executive Order terminating the Policy.[64]

### 4. As experts and government officials predicted, the Family Separation Policy caused severe and long-lasting harm to parents and children.

62. The Family Separation Policy caused extreme and lasting harm to both parents and children. The United States developed the Policy *because* it would cause harm, observed the harm it caused during the Pilot Program, and then adopted the Policy border-wide. A Physicians for Human Rights investigation—based on psychological evaluations of asylum-seeking parents and children who were separated by the government under the Policy—"found pervasive symptoms and behaviors consistent with trauma; most met diagnostic criteria for at least one mental health condition, such as post-traumatic stress disorder, major depressive disorder, or generalized anxiety disorder consistent with, and likely linked to, the trauma of family separation."[65] That trauma would likely result in "higher rates of chronic medical conditions, such as cardiovascular disease, cancer, and premature death."[66] It would also cause "an increased risk of psychiatric disorders such as anxiety, depression, and psychosis, and of detrimental coping behaviors such as smoking and the use of alcohol or drugs."[67] Notably, the investigation concluded that the Family Separation Policy "constitute[d] cruel, inhuman, and degrading treatment" and rose "to the level of torture."[68]

63. Parents and children alike suffered this harm. With respect to parents, and as doctors have testified, "[f]orcible family separation can . . . have devastating psychological and

---

[63] 310 F. Supp. 3d at 1144 (emphasis in original).
[64] Department of Homeland Security, Office of the Inspector General, *DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families* (November 25, 2019) at 19.
[65] Physicians for Human Rights, *"You Will Never See Your Child Again," The Persistent Psychological Effects of Family Separation* (February 2020) at 3.
[66] *Id.* at 24.
[67] *Id.*
[68] *Id.* at 5.

-21-

neurobiological consequences."[69] In adults, psychological trauma causes an elevated risk for

psychiatric disorders including post-traumatic stress disorder ("PTSD"). It can also induce

physiological changes, including, but not limited to, dysregulated stress responding, amygdala

hyperactivity, and deficits in prefrontal cortex control of the amygdala, which are associated with

difficulty regulating fear.[70] The harm has long-term consequences. In the Physicians for Human

Rights investigation involving parents separated from their children under the Family Separation

Policy, researchers found that, even years later, "[a]lmost universally, parents noted continued

disturbances in sleep, nightmares, loss of appetite, loss of interest, fear for the future, constant worry,

hopelessness, and loss of the ability to concentrate," and continued to meet diagnostic criteria for

PTSD and other mental health conditions linked to the separation.[71]

     64.    Children were also severely harmed by family separation. Doctors have cautioned

that "[s]eparated children can face immediate health problems, including physical symptoms like

headaches and abdominal pain; changes in bodily functions such as eating, sleeping, and toileting;

behavioral problems like anger, irritability, and aggression, and difficulty with learning and

memory."[72] Children who have been separated may also experience feelings of mistrust,

bereavement, guilt, or shame. And in the long term, they may be susceptible to chronic conditions

such as depression, PTSD, diabetes, or heart disease.[73] These injuries are often permanent.

     65.    In a statement to Congress opposing family separation, the American Academy of

Pediatrics warned: "We know that family separation causes irreparable harm to children. This type

of highly stressful experience can disrupt the building of children's brain architecture. Prolonged

---

[69] *J.P. v. Sessions*, No. LACV1806081JAKSKX, 2019 WL 6723686, at *10 (C.D. Cal. Nov. 5, 2019) (citing declaration of Dylan Gee, Assistant Professor of Psychology at Yale University).

[70] *Id.* (citing declaration of Dylan Gee, Assistant Professor of Psychology at Yale University).

[71] Physicians for Human Rights, *"Part of my heart was torn away": What the U.S. Government Owes the Tortured Survivors of Family Separation* (April 2022) at 21-22.

[72] Testimony of Dr. Julie Linton, Co-Chair of the American Academy of Pediatricians Immigrant Health Special Interest Group, Hearing Before the House of Representatives Subcommittee on Oversight and Investigations, *Examining the Failures of the Trump Administration's Inhumane Family Separation Policy* (February 7, 2019) at 3243-252, available at https://docs.house.gov/meetings/IF/IF02/20190207/108846/HHRG-116-IF02-Transcript-20190207-U1.pdf.

[73] *Id.*

1   exposure to serious stress—known as toxic stress—can lead to lifelong health consequences."[74]

2   Government officials in the agencies responsible for implementing the Family Separation Policy

3   have themselves testified that "separating children from their parents poses significant risk of

4   traumatic psychological injury to the child."[75] Notably, these harms can persist even after the

5   eventual reunification with a parent or other family.[76] Doctors have concluded that many of the

6   children that the United States separated from their parents will be seriously impaired for the rest of

7   their lives.[77]

8       **B.    Government agents purposefully inflicted extreme distress on the Plaintiff
            Parents and Children by forcibly separating them and keeping them separate**

9       **with little to no information about one another's whereabouts for months.**

10      66.    This case is not about the Family Separation Policy in the abstract; it is about three

11  indigenous Mayan asylum-seeking families who suffered cruel harm as a result of that policy. In

12  addition to the anguish of separation, the families experienced extreme linguistic isolation and total

13  lack of information about *any* of the processes to which government agents were subjecting them. As

14  explained in the specific allegations below, all three families who are Plaintiffs in this action entered

15  the United States by crossing from Mexico into Arizona in May and early June 2018. The

16

17  _____

18  [74] Amnesty International, *"You Don't Have Any Rights Here": Illegal Pushbacks, Arbitration
    Detention & Ill-Treatment of Asylum-Seekers in the United States"* (2018) at

19  34https://www.amnesty.org/download/Documents/AMR5191012018ENGLISH.PDF

20  [75] Testimony of Commander Jonathan White, United States Public Health Service Commissioned
    Corps, Hearing Before the House of Representatives Subcommittee on Oversight and Investigations,
    *Examining the Failures of the Trump Administration's Inhumane Family Separation Policy*

21  (February 7, 2019) at 1084-091, available at

22  https://docs.house.gov/meetings/IF/IF02/20190207/108846/HHRG-116-IF02-Transcript-20190207-
    U1.pdf.

23  [76] *Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enf't*, 319 F. Supp. 3d 491, 503
    (D.D.C. 2018) (citing Julie M. Linton, Marsha Griffin, Alan J. Shapiro, American Academy of

24  Pediatrics Policy Statement, *Detention of Immigrant Children*, Pediatrics, Vol. 139, Num. 4, April
    2017).

25  [77] Testimony of Dr. Jack Shonkoff, Professor of Child Health and Development at the Harvard Chan
    School of Public Health and the Graduate School of Education and Professor of Pediatrics at

26  Harvard Medical School, Hearing Before the House of Representatives Subcommittee on Oversight
    and Investigations, *Examining the Failures of the Trump Administration's Inhumane Family*

27  *Separation Policy* (February 7, 2019) at 3558-562, available at

28  https://docs.house.gov/meetings/IF/IF02/20190207/108846/HHRG-116-IF02-Transcript-20190207-
    U1.pdf.

government forcibly separated these parents and children in CBP's Arizona facilities without notice or explanation. All but one Plaintiff were fluent only in indigenous dialects and spoke little, if any, Spanish; none spoke English. Yet, to the extent that government agents spoke to Plaintiffs at all, it was in Spanish or English, despite protests and other clear indications that Plaintiffs did not understand. Plaintiffs then spent months detained in different facilities, some in full linguistic isolation, unable to understand what had befallen them, with the government facilitating little to no communication between parents and children.

      **1.**     **Government officials forcibly separated Eduardo I.T. and Edwin E.I.I. and kept them separate for nearly three months.**

           **a.**     **Border Patrol officials forcibly separated Eduardo and Edwin and detained them in inhumane conditions.**

67.     In 2018, Eduardo I.T. and his then-16-year-old son Edwin E.I.I. fled Guatemala to seek asylum in the United States. Eduardo and Edwin are Q'eqchi', a Mayan people indigenous to what is now Guatemala. When Eduardo and Edwin arrived in the United States, they did not speak or understand English at all. Edwin spoke and understood Spanish at the time, but Eduardo spoke limited Spanish and could fully communicate only in Q'eqchi'. After abuse and violent discrimination for his Q'eqchi' ethnicity forced Eduardo to leave school at a young age, he never learned to read or write in any language.

68.     Eduardo and Edwin entered the United States on or about May 9, 2018 near San Luis, Arizona. Shortly after they arrived, they heard truck wheels barreling towards them. Border Patrol officers exited from two trucks and began yelling orders in English at Eduardo and Edwin, neither of whom understood the language. From the officers' gestures, Eduardo and Edwin gathered that they should put their hands up and stand against the nearby wall. As father and son stood facing the wall, terrified, the officers stripped them of everything in their possession. Eduardo and Edwin were hungry and thirsty, but the officers did not offer them food or water. Instead, the officers pushed Eduardo and Edwin into the back of a truck with two other men. Edwin heard the other men plead in Spanish to know where the officers were taking them, but the officers did not answer and just slammed the doors. The desert heat intensified inside the truck, and the group sat silently on the

COMPLAINT
Case No:

metal floor. Soon thereafter, they arrived at a Border Patrol station. Although no one told Eduardo or Edwin where they were at the time, government records suggest they were brought to a Border Patrol station—often called a *hielera* ("icebox") because of the punishingly cold temperatures Border Patrol officers maintain inside—within the Yuma Sector in Arizona.

69.     Once at the *hielera*, officers led Eduardo and Edwin to the back of a long line. What appeared to be hundreds of people sat on the floor in a single file. Looking towards the end of the line, Eduardo and Edwin witnessed a pattern that alarmed them. Parents and children would stand up and approach a desk. They would exchange some words with the officers, and then scribble on some paperwork. Then the officers would say something, which often caused the parent to protest. Eduardo and Edwin watched as mothers and fathers erupted into tears, some crying in silence, others screaming. Finally, officers would take the parent and child in opposite directions. Eduardo and Edwin watched Border Patrol officers systematically and seemingly without exception ripping families apart, one by one, for what felt like hours before it was their turn.

70.     Eduardo and Edwin arrived at the desk panicked. Edwin heard one of the Border Patrol officers explain in Spanish that the laws had changed and that any family that crossed the border would be separated and then deported. He did not have time to explain the officer's comment to his father, and no one provided any Q'eqchi' interpretation, so with no idea what was happening or why, Eduardo watched through tears as armed officers took his son away from him. He did not know where Edwin was being taken or whether he would ever see his son again.

71.     As Edwin was escorted away from his father, one officer assured Edwin that he would only be separated for about 15 days. But that was the last time that father and son would see one other for nearly 15 weeks.

72.     Still crying from the loss of his son, Eduardo complied as the officers shepherded him in the opposite direction from where they took Edwin. They took Eduardo to a freezing cell packed with other men all sitting on the floor and shut the door behind him. There were no beds, cots, sheets, blankets, or even enough space on the ground for the men to lie down. Some of the men chose to sleep in the bathroom, despite the foul odor, because there was floor space around the toilet. When Eduardo needed to use the toilet, he had to ask the men sleeping there to give him room.

Because room was windowless and the lights were always on, it was difficult to discern the passage of time, but Eduardo felt like he remained there for days.

73.     During his days in the *hielera*, Border Patrol officers provided little food and no water to Eduardo. A few times a day, the officers would distribute cups of instant noodles to the men in the cell. The noodles were designed to be prepared with hot water, but the officers used only cold water such that the noodles barely softened. It was difficult for Eduardo to eat. Border Patrol officers also did not provide Eduardo potable water. The only drink that Eduardo could access was the water from the dirty sink in the bathroom where people were sleeping. Border Patrol agents did not give Eduardo a cup, so he had to drink from hands, which were filthy because there was no hand soap to wash with in the bathroom. Eduardo also had no ability to clean his body while in the cell. The officers had taken all of his belongings and did not allow him to access any clean clothes to change into. The bathroom did not have a shower or tub, nor was there soap of any kind.

74.     Like Eduardo, many of the men in the cell had their children taken from them by Border Patrol agents. These men would quietly cry and whisper to each other, and Eduardo gathered that they were wondering whether their children were safe. Eduardo understood enough Spanish to hear when some of the men would ask the guards about their children through the cell door. But the Border Patrol officers ignored them, refusing to respond to or even acknowledge their questions. Despite feeling hopeless and afraid for Edwin, Eduardo was too afraid to attempt communication with the guards. He saw that the others' pleas were ignored, and he thought that the guards would not listen to him because his Spanish was so limited. Border Patrol officers did not provide Eduardo with Q'eqchi'/English interpretation and none of the men in his cell spoke Q'eqchi'. Except for the times that he would allow himself to cry, Eduardo remained silent and alone for what was likely two weeks that he spent locked in the *hielera* cell.

75.     When Edwin arrived at his cell after being taken away from his father, frigid air and the eyes of many other children met him at the door. He began to shiver and lose feeling in his body. He felt physically and emotionally numb. Border Patrol officers left the children crowded in a cell with no beds, cots, mats, or anything to sleep on. There was so little room that the children would take turns lying down and standing up. Border Patrol did not provide anything to shield Edwin from

-26-

the cold. Edwin was exhausted, but could not sleep on the crowded, cold, concrete floor. The tiny bathroom in the cell had only a toilet with no sink or water to wash with. The children had no access to running water for cleaning themselves or drinking. Border Patrol officers did not provide Edwin potable water—or any water. Instead, Edwin had to wait for Border Patrol officers to drop off small juice boxes a few times a day. The officers also gave the children instant noodles, but, as with his father, they had not been prepared properly using hot water and were so undercooked that Edwin struggled to eat them.

76.     Many of the children in the cell with Edwin began acting desperate and stir-crazy. One of the boys said that he had been trapped in the cell without seeing the outside world for two months. Others said that they had been there for weeks. Fearing that they too would be caged indefinitely, Edwin and the other newly-detained children asked the officers when they could leave and be with their parents again. The officers either ignored them or responded with a curt "soon." At times, Edwin felt full of grief. At other times, he searched for the sadness and stress inside of him where he thought they should be, but he felt only cold and numb.

77.     After what seemed like two days in the same cell, Edwin was awakened in the middle of the night by loud banging on the cell door. A Border Patrol officer walked in holding a night stick and began to call the names of children in the room. When Edwin heard his name, he walked in fear toward the officer. The officer did not tell him where he was going, so he walked in silence with the other children that were called. Some of the other children acted excited, expressing hope that the officer would take them to their parents. But the officer put Edwin and the other boys in a truck without saying where they were going. When they arrived at their destination, Edwin could not make out where they were because it was so dark. Once inside, the children were taken to a room where they were told to sleep on cots on the floor.

78.     Early the next morning, officers dressed in plain clothes took Edwin and the other children to an airport. The officers instructed the children not to speak to anyone in the airport. On the plane, Edwin saw many other passengers that he recognized as regular commercial travelers by their dress and demeanor. Edwin did not attempt to speak to these passengers for fear that his accompanying officers would punish him. Edwin understood that the role of the government

officials with him and the other children was to physically prevent their movement and force them to stay in custody until they arrived at their destination.

>   **2.    Government officials transferred Edwin to a detention facility over 1,000 miles away from his father, where Edwin experienced grief and illness.**

79.     On or about May 13, 2018, Edwin arrived at St. Peter-St. Joseph Children's Home ("St. PJ's"), an ORR facility in San Antonio, Texas. The following day, a member of the St. PJ's staff executed the intake procedures for Edwin and asked him if he needed anything at that moment. Edwin only had one question: when could he see his father? The staff member assured Edwin that St. PJ's would be a safe place for him while he remained separated from his father and promised Edwin that he would only be there for a month. When Edwin got to his room at St. PJ's, he allowed himself to cry for the first time since being taken from his father. He missed his father terribly and felt alone in the world.

80.     On his first night at St. PJ's, Edwin began to feel painfully ill. Edwin's whole body felt as if it were on fire. He developed a cough, nasal congestion, body aches, sore throat, painful headaches, chills, nausea, and what felt like fever, and his condition deteriorated quickly. He could not eat. Government records state that Edgar was diagnosed with upper/lower respiratory illness and exposed to chicken pox shortly after entering St. PJ's. But no one told him what was wrong, and he feared he was dying.

81.     Within a few days of contracting respiratory illness, Edwin also began to have the sensation that thorny insects were crawling under his skin. Government records indicate that at about this time, Edwin was diagnosed with scabies and exposed to lice, mites, and other bodily infestations. Though they wrote down the diagnosis for their own bookkeeping, St. PJ's staff isolated Edwin from the other children without telling him anything about his condition. Not once did anyone explain what was happening to him or the health risks associated with his diagnoses. He could only guess what was wrong with his body from the pain he felt and because he saw staff cleaning the area where he once sat and slept. Edwin feared for his life.

82.     Edwin's mental health also deteriorated while he was confined to St. PJ's. Edwin cried often, sometimes for extended periods of time without stopping. He felt extreme stress and

1    could not eat. He suffered constant worry and anxiety about when he would see his father again. He

2    panicked that he would be deported back to Guatemala without his father.

3                 **3.**    **Government officials transferred Eduardo to detention facilities around**

                           **the country in barbaric conditions and subjected him to linguistic**

4                               **isolation.**

5           83.     After over a week in CBP custody in Arizona, officers took Eduardo from his cell

6    without explanation. Eduardo saw the officers filling trucks with adult women and men, but he saw

7    no children. Armed Border Patrol officers placed Eduardo and a group of other men into one of the

8    trucks. Eduardo was desperate to know where his son was, but he was too afraid to try to ask the

9    armed officers and knew they would not be able to communicate with him in Q'eqchi'. All of the

10   detained men in the truck were fathers that Border Patrol had forcibly separated from their children,

11   like Eduardo. During the trip, the men spoke quietly with each other. Eduardo assumed the men

12   were talking about their children and he sensed their hope that the children would be waiting at the

13   destination. But Eduardo spent every moment in fear that he was on his way to be deported, and that

14   he would never see his son again.

15          84.     When the truck finally stopped and the doors opened, Eduardo mustered the courage

16   and his limited Spanish to ask one of the officers where they were. The officer responded "San

17   Diego." Once inside the detention center, which appeared to be another *hielera*, Eduardo again

18   summoned the best Spanish he could to beg for information about Edwin. He asked an officer where

19   Edwin was and whether he could call him. Eduardo did not fully understand the Border Patrol

20   officer's response, but he took away that he should not hope to see or speak to Edwin. Eduardo cried

21   and prayed. He was desperate to know if Edwin was safe.

22          85.     Like the detention center in Arizona, immigration officials at the San Diego facility

23   failed to meet basic Eduardo's basic human needs during the several days he was forced to stay

24   there. The cell was extremely crowded, but so cold that Eduardo still felt like he was on the verge of

25   freezing. There was no surface but the hard floor to lie on. Eduardo prayed to go outside to stretch

26   and breathe fresh air, but the officers never allowed him to leave the room. Eduardo remained

27   constantly hungry. Officials again fed him only lukewarm instant noodles that had not been properly

28

1  prepared with hot water. Officials still did not offer Eduardo the opportunity to bathe or change

2  clothes.

3      86.    Within days of arriving at the facility—likely while, unbeknownst to him, his son

4  Edwin was also enduring painful illnesses—Eduardo became violently ill. Still suffering the stench

5  of the same unwashed clothes that he had arrived at the border in more than two weeks earlier,

6  Eduardo experienced diarrhea, severe stomach pain, and what felt like fever. There were so many

7  men in the cell that Eduardo struggled to find a place to lie down. When he could find space, he

8  agonized alone on the cold cell floor. Eduardo feared speaking to the officers due to his limited

9  Spanish and inability to speak English, but hoped that his visible signs of deterioration would make

10  the officers care enough to help him. Days went by and none of the immigration officials at the

11  detention center asked him about his health or how he was feeling. For days Eduardo received no

12  medical attention, no blanket or bedding to keep warm, nor an opportunity to clean himself. Officials

13  again did not provide Eduardo with clean water or a cup for water from the bathroom sink, so

14  Eduardo had to force down foul-smelling water from the bathroom sink with his unwashed hands, as

15  he had done in Arizona. This level of neglect made Eduardo feel that the immigration officers

16  viewed him as lower than an animal.

17      87.    Eduardo survived his untreated illness, hunger, and dehydration. But even as his

18  sickness faded, Eduardo was overcome with the pain of having lost all contact and knowledge of his

19  son, Edwin. Eventually, Eduardo was again transferred. Because no one ever communicated with

20  Eduardo about where he was being taken, it is unclear where Eduardo was transferred next, though

21  government records suggest it may have been the Yuma or Wellton Border Patrol Station. Eduardo

22  spent what felt like an additional several days in Border Patrol custody there, still unable to bathe or

23  change clothes. At this facility, as at the others, Border Patrol officers did not give Eduardo any

24  information about where Edwin had been taken, how he was doing, or when—if ever—Eduardo

25  would see him again. Eduardo spent every day and every night thinking about Edwin, wondering

26  whether his son was even alive.

27      88.    Border Patrol officers did not provide Q'eqchi' interpretation to Eduardo at any point

28  during his time in custody. Eduardo was deeply afraid of the officers that he encountered at each

COMPLAINT
Case No:

facility. He also felt ashamed speaking to the officers with his rudimentary Spanish skills. Any time he summoned the best Spanish he could muster to ask Border Patrol officers where Edwin had been taken or whether he was safe, the officials refused to answer, or even acknowledge, his questions. He thought that the officers either did not understand him or thought he was too low to address.

89.     Eventually, Border Patrol transferred Eduardo to ICE custody at Florence Correctional Facility ("Florence") in Florence, Arizona. Again, officials told Eduardo nothing about where they were taking him or where his son was located. After having spent weeks in the putrid, crusty clothes in which he had traveled from Guatemala without any means to bathe himself, immigration officials finally permitted Eduardo to wash himself and received fresh clothes for the first time since he was apprehended.

90.     Eduardo was overwhelmed with anxiety about Edwin, so he spent his first few days summoning the courage to speak to an officer about his son. In Florence, which is operated by a private, for-profit prison company, people in custody could make written requests that would be transmitted to ICE. Because Eduardo was unable to write a statement himself, he asked an official to write for him a statement begging to be reunified with Edgar as soon as possible. As best he could, Eduardo expressed to the official that the detention conditions and his anguish to be reunited with his son made it hard for him even to think. Before Eduardo received an answer to his request to finally hear from his son, immigration officials again transferred Eduardo: this time to Eloy Detention Center ("Eloy"), in Eloy, Arizona.

91.     During his time in ICE custody, immigration officials and their contractors spoke to Eduardo only in Spanish and English. He did not receive any interpretation to Q'eqchi'. Eduardo often did not understand what was said to or asked of him, and therefore he often nodded nervously in response or was unable to respond. He would often grow quiet when spoken to due to his lack of understanding. Not being able to communicate made Eduardo feel powerless. Government documents erroneously state that Eduardo was a monolingual Spanish-speaker and could read and write in that language. In fact, Eduardo has great difficulty communicating or understanding information in Spanish, to the point that it would have been immediately clear to anyone questioning him in Spanish that he did not understand their questions and could not respond. Eduardo cannot

1   read or write in any language. Eduardo could not read any document that any immigration official

2   presented or forced him to sign. Even if such documents were ever read to him in English or

3   Spanish, Eduardo still could not have understood them.

4          **4.     After nearly two months of detention with no information about the**
           **other's whereabouts or well-being, officials allowed Eduardo and Edwin**
5          **to speak to each other by phone.**

6          92.     Sometime after being transferred to Eloy, Eduardo was sitting in his cell when an

7   officer called his name. Because the officer did not provide translation to Q'eqchi' to explain what

8   was happening, Eduardo thought he heard the officer say that he had a visitor. He became excited,

9   hoping that the visitor was Edwin. The officer took Eduardo to an office and sat him next to a phone.

10  When Eduardo heard his son's voice on the phone, he broke down crying.

11         93.     Officials allowed father and son about ten minutes to speak. Edwin, who could

12  communicate in Spanish, begged the St. PJ's social worker for more time on the phone with his

13  father. The social worker refused. As soon as Edwin was forced to hang up the phone, he

14  immediately felt the heartache of how far he was from his father.

15         94.     After terminating their initial call, officials told Eduardo and Edwin that they would

16  be permitted to speak to one another once a week on Thursdays. These calls were extremely difficult

17  for both Eduardo and Edwin. Their discussions quickly became filled with hopelessness and despair.

18  Detention officials and St. PJ's staff told Eduardo and Edwin that Edwin would be placed in long-

19  term foster care. Officials explained that indefinite separation was likely because Eduardo would

20  soon be deported and Edwin had no other family in the U.S. capable of caring for him. Though

21  officials never said so directly, Edwin got the sense that he would be later deported without his

22  father. Ultimately, Eduardo and Edwin were permitted to speak to one another only four or five

23  times during their 14-week separation, which they had been made to understand would be

24  permanent. The uncertainty about whether (and when) he would ever see his father again made

25  Edwin feel alone and terrified.

26         95.     Throughout the month of July 2018, immigration officials' and their contractors'

27  actions left Eduardo and Edwin confused about their future, wellbeing, and ability to ever see each

28  other again. Detention officials and St. PJ's staff again told Eduardo and Edwin that Edwin would

-32-

remain in long-term foster care because Eduardo would be deported without his son. Around that time, government records show that immigration officials began preparing both Eduardo and Edwin for physical removal to Guatemala. Edwin thought that the government would deport his father, but also feared that he would be deported alone thereafter. This period exacerbated Eduardo and Edwin's already acute trauma, anxiety, fear, stress, and sadness that they could be taken by immigration officials and deported at any time, either together or separately. At no point during their more than 14 weeks in detention did government officials indicate to Eduardo and Edwin that they would be reunited, ever.

96.     About six weeks into Eduardo and Edwin's forcible separation, Judge Sabraw issued an order in the *Ms. L* litigation enjoining the Family Separation Policy and ordering that government officials reunify children over five with their parents by July 26, 2018. *See Ms. L. v. ICE*, 310 F. Supp. 3d 1133, 1149 (S.D. Cal. 2018). Nevertheless, immigration officials waited until late July to even begin the process of reunifying Eduardo and Edwin. On or about July 23, government agents transferred Edwin over 500 miles by car and bus from St. PJ's to a temporary tent complex in Tornillo, Texas. During the drive and after arriving, Edwin was too afraid to talk to anyone, including the other children. His mind spiraled with fear that the officials had begun his deportation process to Guatemala, that they were taking his father away from him forever, and that he would be alone wherever he ended up. He could not stop crying.

97.     The conditions in Tornillo were difficult to bear. Without functioning air conditioning, Edwin languished in the West Texas desert summer heat without any information about why he and the other children were there. Edwin spent what felt like at least a week in the tent city before he was put on a bus with many other separated children. It was only when Edgar was boarding the bus that officials told him he was being taken to his father. He felt relieved, but also uncertain that the officials were telling him the truth. He could not shake the fears he had been living with for almost three months.

1

2

**5.     After the court-imposed reunification deadline had already expired, government officials finally reunified Eduardo and Edwin.**

3      98.     In approximately the first week of August 2018, after the court-imposed reunification

4   deadline had passed, immigration officials took Eduardo from Eloy to another location without

5   telling him where he was going. Finally, Eduardo was reunified with Edwin. Eduardo cried

6   immediately at the sight of his son. Edwin was relieved to see his father, but also felt disoriented and

7   confused by what had happened to them. He tried to focus on the happiness he felt to be back with

8   his father, but struggled to overcome the persistent sense of worry that had built up.

9      99.     Eduardo and Edwin were not released from custody at that point. Instead,

10   immigration officials boarded them onto a plane with a group of other migrant families and

11   transported them to another ICE detention facility at Karnes County Residential Center ("Karnes")

12   in Karnes City, Texas. There, an asylum officer from United States Citizenship and Immigration

13   Services ("USCIS") conducted a credible fear interview over the course of multiple sessions,

14   between approximately August 8 and 14, 2018. Although the Asylum Office provided an interpreter

15   who claimed to speak Q'eqchi', Eduardo did not understand the interpreter. After the interview,

16   officials presented Eduardo with various forms that he did not understand and told him to sign them.

17   Some of the documents were in English, others were in Spanish. Eduardo thought that these papers

18   meant that he would soon be deported. Under the pressure of the officials and believing that he had

19   no choice, he signed. Government records indicate that among the papers Eduardo signed was a

20   form declining Immigration Judge review of a negative credible fear determination by the Asylum

21   Office. At the time, Eduardo did not understand what he was being cajoled to sign or to what he was

22   agreeing.

23      100.     After about two weeks of detention at Karnes, ICE abruptly released Eduardo and

24   Edwin without explanation. ICE officials left Eduardo and Edwin at a bus station in an unknown

25   location in Texas. No one from ICE explained where they were. No one explained why Eduardo and

26   Edwin had been separated, why they had been reunited, what the status of their asylum claim was,

27   and what would happen to them next. Lost and afraid, Eduardo and Edwin managed to take a series

28

1  of buses through Arizona and Southern California before arriving in the San Francisco Bay Area,

2  now their home.

3       101.   At no point were Eduardo or Edwin ever charged with or convicted of a crime.

4       **6.      Forcible separation caused Eduardo and Edwin severe and lasting harm.**

5       102.   Months after being released from detention, Eduardo arrived at an appointment at an

6  ICE office in San Francisco. There, speaking in Spanish without Q'eqchi' interpretation, Eduardo

7  understood that the ICE officials were threatening to deport him. The ICE officials based their

8  threats on the unreviewed negative credible fear finding from his deeply flawed interview, which

9  had resulted in a removal order. To settle a lawsuit that credible fear interviews conducted under the

10  extreme coercion and distress of separation violated due process, the government had agreed to

11  provide separated parents like Eduardo with a follow-up interview before executing their removal

12  orders. *See Dora v. Sessions*, Case No. 3:18-cv-00428-DMS-MDD (S.D. Cal. Sept. 12, 2018)

13  (consolidated with *Ms. L v. Sessions* and *M.M.M. v. Sessions*). But instead of informing Eduardo of

14  his class membership, ICE agents in San Francisco intimidated him and threatened to deport him,

15  sending him into a spiral of fear even after he believed he had found safety. Only with intervention

16  of counsel was Eduardo able to inform ICE of his class membership and move forward with his

17  asylum application, which has now been fully submitted and awaiting decision for over 17 months.

18       103.   Even since Eduardo and Edwin reunified and were released from detention, they have

19  remained emotionally trapped in their experience of separation and detention. Eduardo has been

20  diagnosed with anxiety and depressive disorders that cause him severe distress and impairs his

21  normal functioning. Worry and fear consume him so strongly and constantly that he cannot control

22  the thoughts in his mind, and he often struggles for air as his heart pounds in his chest. Eduardo

23  frequently wakes up shaking and sweating from nightmares in the middle of the night, and because

24  of this, gets very little sleep. Outside of pharmaceutical intervention, Eduardo will likely never be

25  able to receive mental health services directly in his native language, Q'eqchi'. Therefore, it is

26  unlikely that therapy would even help.

27

28

104.    Edwin feels like the traumatic separation experience is something that will live with him and be a part of him for the rest of his life. He continues to fear immigration officials. Memories of his time alone at St. PJ's overwhelm him with sadness and the feeling that he is not safe.

**C.     The government forcibly separated Ignacio P.G. and Leonel Y.P.G. and refused to reunify them for nearly two months.**

**1.     Border Patrol officials forcibly separated Ignacio P.G. and Leonel Y.P.G. and detained them in inhumane conditions.**

105.    In 2018, Ignacio P.G. and Leonel Y.P.G. fled Guatemala to seek asylum in the United States. They are Mam Maya, indigenous to what is now Guatemala, and speak the Santiago Chimaltenango dialect of the Mam language. When they came to the United States, Ignacio understood only a limited amount of Spanish. Leonel could not speak Spanish at all. Neither Ignacio nor Leonel spoke or understood English. At the time, Leonel was six years old and too young to perform even basic tasks to take care of himself.

106.    On or around the morning of May 18, 2018, Ignacio and Leonel entered the United States in or around San Luis, Arizona, where they soon encountered federal Border Patrol agents. Speaking only English and Spanish, the agents began questioning Ignacio and Leonel. Ignacio had a difficult time understanding the agents, but understood them to be asking him to show them any documentation he had. He also understood them to be asking if Leonel was his son and where they were going. Ignacio produced his documents, including Leonel's birth certificate, and confirmed that Leonel was his son. The agents made Ignacio sign documents. Ignacio did not know what the documents said and the agents did not explain them. The agents said only "sign here." Ignacio followed their orders.

107.    The agents then painfully bound Ignacio in handcuffs behind his back. Ignacio cried as the agents loaded him and Leonel into a vehicle, where Ignacio remained handcuffed and in tears as they drove to a detention center. Leonel was visibly terrified throughout their arrest and transport. Ignacio tried to comfort Leonel. "Don't be afraid," he told Leonel in Mam, "I'm here with you." Though the agents did not tell Ignacio or Leonel where they were going, government documents indicate that agents drove Ignacio and Leonel to Border Patrol's Yuma Station in Arizona.

108.    At the Yuma *hielera*, Border Patrol agents took Ignacio and Leonel's belongings, including Ignacio's wallet and both of their shoelaces. Father and son waited for what felt like hours while officials called people up to a desk by name. Eventually, the agents called Ignacio's name. Border patrol agents photographed Ignacio and Leonel and once again presented Ignacio with papers to sign. Ignacio did not understand or read Spanish well enough to understand the documents. No one explained the documents to him or provided him with Mam interpretation, but he felt pressure to sign, so he did.

109.    After Ignacio completed the paperwork, agents instructed Ignacio and Leonel to sit and wait once again. After what felt like an hour, the agents called Ignacio's name again. This time, agents sent Ignacio into one room and Leonel into a separate room. When Ignacio saw that Leonel was going to spend the night apart from him, he felt afraid.

110.    Border Patrol agents subjected both Ignacio and Leonel to abysmal conditions of confinement in their separate cells. The cells were full—Ignacio's with other men, Leonel's with children—with everyone crowded together on the floor. The agents did not provide mats, cots, beds, or anything to sleep on, leaving Ignacio and Leonel to each sleep on the cold concrete floor of the cells with only a thin Mylar sheet to keep warm. Ignacio saw inside Leonel's cell as the agents left him there and felt deeply saddened by the conditions. Even more, he felt concerned for Leonel's well-being, especially because Leonel did not speak English or Spanish. Ignacio felt completely helpless. Neither Ignacio nor Leonel could sleep that night.

111.    The next morning, Border Patrol agents called Ignacio out of his cell and questioned him again.  He understood them to be asking him again if he was Leonel's father. Ignacio again confirmed that he was. From what Ignacio could understand, the agents told Ignacio that they would be taking Leonel away and that he needed to come tell Leonel not to cry. Ignacio tried to voice his concern to the agents, explaining that Leonel was too small, that he spoke only Mam and did not speak Spanish, and that he would not be able to communicate without his father. The agents told Ignacio that Leonel would be taken to another state where someone else would take care of him. Ignacio did not feel reassured. Instead, he felt worried and helpless, and felt like all he could do was cry.

1      112.    The agents brought Ignacio to a waiting room, where he found Leonel in tears.

2  Ignacio fought back his own tears as he told Leonel, in Mam, that the agents were taking Leonel

3  away. Ignacio told Leonel not to cry or be sad, as the agents had ordered him to do. This made

4  Leonel cry even more. Leonel hugged his father tightly. Both Leonel and Ignacio were crying when

5  Ignacio realized that two Border Patrol agents were standing over them, waiting to take Leonel

6  away. Sobbing, Ignacio had to pry Leonel's hands off of him. The agents left Ignacio in the waiting

7  room, forcing him to watch as they took his son away. The agents then brought Ignacio back to the

8  adult cell. No one told Ignacio where Leonel had been taken, why Leonel had been taken, or whether

9  Ignacio would see his son again.

             **2.**      **Government officials detained Ignacio in a series of facilities in deplorable conditions, subjected him to linguistic isolation, and failed to provide him information about the well-being or whereabouts of his son.**

13      113.    Ignacio remained in the Yuma *hielera* for what felt like a week, although the

14  experience was deeply disorienting. Ignacio was detained in a windowless room with no way to tell

15  the time and where Border Patrol agents kept the lights on 24 hours a day. At no point during his

16  detention did agents provide anything for Ignacio to sleep on, so he remained on the cold concrete

17  floor with only a thin Mylar sheet. The cell was so full that Ignacio could hardly move; once lying

18  down, he could not turn his body for the press of other men's bodies on all sides. Neither the

19  crowding nor the Mylar sheet alleviated the severe cold of the cell. Ignacio struggled to sleep, both

20  because of the conditions in the cell and the extreme distress he felt not knowing where Leonel was.

21      114.    In addition to cold and sleep deprivation, Border Patrol agents deprived Ignacio of

22  adequate food and water at the Yuma *hielera*. As they had with Eduardo I.T. and Edwin E.I.I.,

23  agents provided Ignacio only instant noodle soup with access to cold water, leaving the noodles hard

24  and inedible. At first, Ignacio did not eat because he could not stomach the raw soup. Eventually,

25  gripped by hunger, he had to force it down. The agents also failed to provide Ignacio with potable

26  drinking water or even a cup. Instead, Ignacio was forced to drink water from the latrine sink,

27  cupping his hands under the faucet. The water smelled and tasted heavily of chlorine and made

Ignacio nauseous. The bathroom area itself was disgusting, smelling constantly of excrement and urine. The floor and toilets were squalid.

115.    Border Patrol agents never offered Ignacio the opportunity to shower, change, or wash his clothes. Instead, they left him and the other detained people around him in filthy clothing for days. Ignacio could tell that he smelled terrible, as did the people around him—there was no soap. The agents also did not provide Ignacio with a toothbrush or toothpaste. Because Ignacio had observed the agents yelling at people in custody who spoke to them or made requests, he felt helpless.

116.    One night, Border Patrol agents handcuffed Ignacio and loaded him onto a bus along with other people. It was a cold night, and the temperature dropped over the course of the long ride, but the agents in the bus turned the air conditioning on full power. Ignacio and the other people in custody on the bus had the air vents pointed directly at them, blasting them with frigid air. The cold air was unbearable. The people in custody complained and eventually some screamed, but the agents did not turn off the air conditioning until the sun rose and the temperatures outside began to warm.

117.    The bus ride lasted all night and well into the following day. When the bus arrived, agents unloaded Ignacio and led him into an ICE-operated detention center. No one explained to Ignacio where he was or why. Nor did any federal agents—or anyone—provide Mam interpretation to Ignacio to allow him to ask questions or receive information. Government records suggest that Ignacio had been transported to the Otero County ICE Processing Center in Chaparral, New Mexico, a facility operated by a private, for-profit corporation. The day after Ignacio arrived, he was put in handcuffs and leg chains and locked in solitary confinement for about an hour. He was never given an explanation. After that, he was detained in crowded dormitories where illness was common. Ignacio became sick with what felt like a fever and a bad cough while in custody there. Facility staff did not clean the bathrooms, forcing people in custody to clean the bathrooms themselves. Ignacio did not receive enough to eat and continued to be hungry throughout his time in detention.

118.    ICE detained Ignacio for over a month and a half. ICE did not provide Ignacio any information about where his six-year-old son was or how he was doing—even whether he was still alive. And Ignacio felt that there was no one to ask—he realized that no one detained with him,

1    including those who spoke Spanish, received even basic information from the officials. After

2    witnessing Border Patrol agents yell at any detained person who dared to ask a question in the

3    *hielera*, Ignacio feared attempting to speak to any officer. Even if Ignacio could have mustered the

4    courage to inquire about the basis for his incarceration or about his son, ICE never provided a Mam

5    interpreter to enable Ignacio to communicate.  Ignacio could do nothing but wait, fearful and anxious

6    about what might happen to him, and may have already happened to his son.

7

8            **3.**        **Ignacio and Leonel endured grief and linguistic isolation in separate detention centers before speaking to one another by phone and eventually being reunified under court order.**

9

10         119.    After about a month in detention, an officer beckoned Ignacio. From what Ignacio

11   understood of the officer's Spanish, Leonel was trying to reach him. The officer gave Ignacio a

12   phone number to call—but no way to actually make the call. Phone use at the ICE detention center

13   was available to only those who could pay the steep cost for calls. No one at ICE provided Ignacio

14   with free phone calls to his son, even though, as he would soon learn, Leonel was also still in

15   government custody. In desperation, Ignacio tried asking other people in custody who had been able

16   to afford phone credits if he could use their calling cards to call his son. He found a man kind

17   enough to donate credits to him. Ignacio used the phone time to call a relative to ask for money so

18   that he could finally speak with Leonel. Eventually, the money came through and Ignacio called his

19   son.

20         120.    Ignacio's heart broke on his phone calls with Leonel. Ignacio could hear voices of

21   other children in the background, but Leonel said he could not talk to any of them—or any of the

22   adults—because no one spoke or understood Mam. Ignacio tried to reassure Leonel that everything

23   was going to be okay, to try not to cry, to try not to be sad, and that Ignacio would be with him soon.

24   In truth, Ignacio had no idea if he would ever see Leonel again. Ignacio kept his calls with Leonel to

25   just a few minutes at a time because he did not want to run out of money and risk of never talking to

26   his son again.

27         121.    For his part, Leonel was lonely, scared, and emotionally distressed in the HHS facility

28   in which he spent nearly two months. After the *hielera*, immigration officials put him—a six-year-

old—on an airplane to a detention center for children. It was his first time on a plane. Despite being surrounded by people on every side, Leonel was completely alone. Leonel could speak to no one because immigration officials failed to provide Mam interpretation. Even once he arrived into ORR custody, no one spoke Mam, nor were any Mam interpreters ever engaged by the government to inform him of what was going on. Leonel was terrified, having no idea what would happen to him or his father. Government records indicate that Leonel was detained in ORR custody in Harlingen, Texas, although this was not communicated to him or Ignacio during their separation.

122.    On or around July 19, 2018, without telling him what they were doing or where he was going, ICE agents loaded Ignacio into a vehicle and drove him to a place where he finally saw his child. Leonel was so changed that Ignacio initially did not recognize his son. Leonel did not look like the happy six-year-old that Ignacio had known. It was clear that Leonel had not eaten much, and he looked very sad. After their nearly two-month separation, Leonel also did not recognize his father. When Ignacio and Leonel finally arrived in Oakland, where they would live, Ignacio discovered that in addition to being malnourished and depressed, Leonel was filthy and had a head full of lice.

123.    At no point were Ignacio or Leonel ever charged with or convicted of a crime.

**4.    Forcible separation caused Ignacio and Leonel severe and lasting harm.**

124.    Both Ignacio and Leonel continued to experience the traumatic effects of separation long after their reunification. Ignacio has had nightmares about his arrest and detention without Leonel, especially about the *hielera*. He talks and jumps in his sleep. Ignacio has felt deep sadness when, as often happens, thoughts about how immigration authorities treated him and his six-year-old child invade his mind. He cannot shake the memory of his son's broken-down and downtrodden face when they were reunited. For a long time after his release, seeing police officers triggered Ignacio to envision them chaining his hands and ankles, and taking him back to the *hielera*. These visions evoked trembling fear in Ignacio. A simple act like leaving the house, even to go to the store, became an emotional obstacle that Ignacio sometimes could not overcome. Fear that he could be arrested again at any time and sent back to the *hielera* made Ignacio's mind race.

125.    Leonel experienced disrupted sleep long after arriving in California. He struggled to settle in his sleep, moving constantly, jumping, and waking from nightmares. It took several months after release and reunification with Ignacio for Leonel to develop a normal appetite. Ignacio continually reassured Leonel, "I'm here for you and they won't take you away anymore." Leonel remained sad and depressed after their reunification. Much of the child that Ignacio raised for six years was hidden behind a shadow of sadness. Leonel remained shut down. Leonel would sit like a stone for long periods without talking or playing. When he did speak, Leonel would tell Ignacio that he kept thinking about how much he cried when the agents took him and how much he cried in detention.

**D.    The government forcibly separated Benjamin J.R. and William A.J.M. and refused to reunify them for over nine months.**

**1.    Border Patrol agents separated Benjamin and William and subjected them to inhumane detention conditions.**

126.    In 2018, Benjamin J.R. and his son William A.J.M., then 15, fled Guatemala to seek asylum in the United States. Benjamin and William are Mam Maya, indigenous to what is now Guatemala. They speak the Todos Santos dialect of the Mam language. When they arrived in the United States, William spoke and understood some basic Spanish, but Benjamin spoke almost no Spanish. Neither spoke English.

127.    On the final stretch of their journey to the United States, Benjamin and William walked through the desert for more than half a day without food or water. They entered the United States near San Luis, Arizona in the early morning on or about June 2, 2018. Almost immediately, Benjamin and William encountered Border Patrol officers.

128.    When Benjamin saw the officers, he first noticed that they were carrying guns. The weapons made Benjamin extremely nervous. The officers gave them orders in English, but neither Benjamin nor William could understand. Benjamin gathered that the armed officers wanted him to surrender his belongings, so he gave the officers everything without resistance. The officers threw Benjamin and William into the back of a truck full of other adults and children. They rode in silence and fear to an unknown destination. After some time, the truck stopped, and they arrived at a place that government records indicate was the Yuma *hielera*.

-42-

129.     Border Patrol officers then shuffled Benjamin and William into a large waiting room, full of other detained migrants. Benjamin and William were shivering from cold, hunger, and thirst. Border Patrol officers did not offer them food, water, or anything they could use to warm themselves. Benjamin and William waited for what felt like hours in the room, watching officers seated at a desk call migrants' names one-by-one. The room was noisy and Benjamin did not understand what was happening once people got to the desk. William noticed in the large room that there were children everywhere, including many who appeared to be even younger than him. He saw and heard them crying, but did not know why. Seeing the other children suffering, William could not hold back his own tears and began to cry.

130.     Benjamin heard his last name called and approached the desk. The officers were sitting behind the desk, typing on computers, and speaking exclusively in English to Benjamin and William. Benjamin shook his head and insisted to the officers, "*Hablo Mam*" ("I speak Mam"). The officer stared back at him blankly, seemingly indifferent to what Benjamin just said. He resumed talking to Benjamin and William, again only in English. Benjamin repeated, "*Hablo Mam, hablo Mam.*"

131.     The officer ignored Benjamin and continued speaking. The officer presented Benjamin with a piece of paper, pointed to a line at the bottom, and gave Benjamin a pen. Benjamin looked down and saw what looked like English words all over the page. Again, he said "*Hablo Mam.*" In response, the officer motioned toward the line, indicating that Benjamin needed to sign the paper. Benjamin started to weep as he signed his name on the line. He was desperate to know what the officer was saying to him, to be able to ask what was going to happen to him and his son. Overwhelmed by the situation and the sight of his father crying, William also wept.

132.     Despite Benjamin's insistence that he spoke Mam, government records completed upon his entry incorrectly state that Benjamin and William's native language was Spanish. The records also incorrectly state that Benjamin spoke no other language or dialect. Benjamin has great difficulty communicating or understanding information in Spanish, to the point that it would have been immediately clear to anyone questioning him in Spanish that he did not understand their questions and could not respond.

-43-

133.     Benjamin's terror intensified when multiple officers approached from the rear and called William's name. William turned around and the officers gestured for him to walk towards them. William did not want to leave his father's side, but he saw the officers' weapons in their side holsters. Devastated and terrified, he sobbed and followed them. Benjamin cried, heartbroken, sobs wracking his whole body, while he watched his son walk away. He wanted to call out to his son, but the room was overwhelmingly loud. He wanted to go to his son, but felt the armed officers' eyes on him. All Benjamin could do was cry, because he thought the officers would shoot him if he tried to stop William from leaving. He knew that he could not beg the officers to stop because none of them would understand what he was saying. In that moment, Benjamin felt completely worthless. Knowing that he could do nothing made him feel like he was nothing.

134.     After Border Patrol officers took William from him, they pushed Benjamin towards a line with other detained men. Border Patrol officers approached Benjamin and yelled what sounded like commands at him in English, which he could not understand. From what was happening to the other men ahead of him, Benjamin understood that he was being told to take off all his clothes. He had to strip down to his underwear while the officers watched him. Benjamin felt ashamed and exposed. He had seen gangs in Guatemala strip civilians down similarly right before lining them up and murdering them with machine guns. Confronted with those memories and with no ability to know or ask what was happening, Benjamin believed that the officers were preparing to kill him. He panicked and wondered if somewhere in the detention center, they were doing the same to William.

135.     Border Patrol officers had taken William to a cell full of other migrant children that had been separated from their parents. In the cell, William noticed that most of the children were crowded around a small window. William noticed the children were crying, some of them were screaming. He did not know why until he saw what they were looking at. Through the window, William could see adults in another cell not too far away. Those faces, too, were streaming with tears. William realized that these adults were the children's parents. William eventually saw Benjamin through the window. He started crying and waving to get Benjamin's attention. William saw his father's face was also wet with tears. William felt overwhelmed with sadness as he touched

the glass. Throughout his time in the cell, William would search for his father's face through the window. When they saw one another, they would weep.

136.     After taking William from him and leaving him terrified, Border Patrol detained Benjamin in a cell full of other men. Before the officer closed the door behind him, Benjamin desperately wanted to ask about William. But he said nothing, knowing that the English-speaking officer would not provide him with a Mam interpreter. Border Patrol had not provided Benjamin with food or even water since they arrested him near the border half a day earlier. Benjamin was hungry and thirsty. He went to the cell's bathroom sink to drink water but an odor of urine and feces permeated the bathroom area and nauseated Benjamin. Remnants of human waste soiled the bathroom floor and toilet area. Border Patrol never cleaned the bathroom during Benjamin's detention there, which lasted almost a week. The stench was putrid.

137.     Benjamin looked around the crowded room and saw that there were no beds or chairs, so he found a small space on the floor. Officers had given him a thin Mylar sheet but nothing else to sleep on or to warm him on the cold concrete. He felt exhausted but he could not sleep. The room was noisy because the officers would come at all times of the day and night, bringing new people into the cell, or calling names to take people out of the cell. When he would finally start to drift into sleep, nightmares about William would startle him awake and he would start to cry. Benjamin remained in the cell for what felt like days.

138.     Meanwhile, Border Patrol officers detained William separately from his father in similar conditions. Officers detained William in a cell filled with children crowded on the concrete floor. Neither William nor any of the other children had beds, mats, cots or any surface other than the floor to lie on. Officers had given William and the other children only thin Mylar sheets to warm them. In the cell, William was packed so tightly with the other children that their limbs touched. The bathroom floor was constantly moist with urine and the smell permeated the cell. No official ever came to clean the bathroom. Border Patrol provided only instant soup noodles. William's stomach growled throughout the day. Border Patrol never gave William or the other children anything to drink, so they had to use the bathroom faucet. The faucet water tasted and smelled like chemicals.

William feared that the water was contaminated, but he drank it because he had no choice. William cried for hours every day.

139.    Eventually, Border Patrol officers called Benjamin and William out of their cells and led them to a hallway, where they saw one another. At first, William believed that his prayers were answered and he was being reunited with his father. But then William understood the officer telling them, in Spanish, to say goodbye to each other because they were going to be separated. Father and son rushed over to each other and embraced in a tight hug. Both wept. They prayed aloud together for God to save them. The officer then ordered that William sit in a chair against the wall. The officer took Benjamin back to his cell. William wept so hard that he could not see straight. When the officer came back, he motioned to William that it was time to go.

140.    Back in the cell, Benjamin thought about his son day and night. He wondered why Border Patrol had taken William away, where William could be, and what the officers were doing to him. He was desperate for any information about William but did not feel safe asking the officers anything because he knew he would not understand their answers. Because the other men detained in the cell seemed to only speak Spanish, Benjamin could not even communicate with them. He wished that he could ask them if their children had been taken away, and if they knew why this was all happening. Instead, Benjamin was trapped on the floor of the cell, surrounded by people, but in linguistic isolation.

141.    Benjamin remained in the cell for what felt like nearly a week. The rancid bathroom had no soap or shower area. Border Patrol never provided Benjamin with a chance to bathe, brush his teeth, or wash his hands with soap. He began to feel disgusting in his own skin, making it even more difficult to sleep. His clothes were filthy; Border Patrol also had not allowed him to change clothes, and he had already been wearing the same clothes for days before he arrived at the detention center. Once or twice a day, Border Patrol brought mushy, cold instant noodles and small juice boxes to Benjamin and the other men in his cell. Benjamin's stomach felt empty most of the time, and he felt dehydrated.

1

2.      **Government officials continued to detain Benjamin in linguistic isolation and with limited ability to contact William for over nine months, causing Benjamin to contemplate suicide.**

2

3

4       142.    Eventually, an officer came to Benjamin's cell and called his last name. The officer

5       shackled Benjamin at his wrists and ankles before allowing him to leave the room. Benjamin noticed

6       many other detained men in chains standing out in the hall. Armed officials then shepherded the

7       group to large buses and made them board, without explanation. Once again, Benjamin felt his

8       desperate questions about William bubble in his throat. He swallowed them because he thought that

9       the officers would either ignore him when he spoke in Mam or punish him for speaking at all.

10      Benjamin was nervous, but part of him hoped that William would be waiting wherever the bus was

11      headed. He sat in silence throughout the hours-long journey, hoping he would see his son again.

12      143.    When they arrived at the next detention center, Benjamin, still bound at the ankles

13      and wrists, looked around frantically for William's face. The hope drained from him as he realized

14      that he didn't even see children of William's age, only adult men. Benjamin felt devastated and his

15      mind returned to an anxious spiral of questions about William's wellbeing. He broke down.

16      144.    Next, federal immigration officers called each of the detained men by name up to a

17      desk. Benjamin waited for his turn and prayed to have the chance to ask about William. When he

18      approached the desk after being called, Benjamin realized that he would not be able to communicate

19      with the officer, who spoke to Benjamin only in English. Benjamin felt dejected and powerless once

20      more. He remained silent because he did not understand what the officers were saying to him. They

21      put a piece of paper with lots of words on it in front of Benjamin and motioned for him to use the

22      nearby pen to sign his name. One side of the paper appeared to Benjamin to be English, and the

23      other side Spanish. Benjamin could read neither side of the document, but he felt that he had no

24      choice but to comply with the officer's demands.

25      145.    After forcing him to sign documents without Mam interpretation, the officers sent

26      Benjamin into a cold cell, again with only a Mylar sheet. He looked around, and once again saw

27      detained men lying on the floor. There were no beds, no cots, no chairs. His hopes to see his son

28      were crushed, and he was physically exhausted. He slept on the frigid floor alone.

-47-

146.    For weeks, federal immigration authorities transferred Benjamin to different facilities, always abruptly and without explaining to Benjamin where he was being taken. Each time, immigration officers would come into his cell and call his name. To the extent that they spoke to him at all, the officers never provided Mam interpretation. Benjamin would wonder each time whether William would be waiting for him at the next destination. Each time he arrived at a new facility, Benjamin would break down and cry when he did not see William. Benjamin never felt like he could ask the officers what was happening because the government did not provide any Mam interpretation.

147.    Only after what was likely Benjamin's third transfer, to ICE custody at the Federal Correctional Institute Victorville ("Victorville") in California, did Benjamin hear a government official speak William's name. Benjamin had anguished for weeks in worry over his son's wellbeing, so he was desperate to know what the officer had to say. When the prison guard approached Benjamin, he spoke Spanish, most of which Benjamin did not understand. Benjamin understood the guard to be asking for William's date of birth, so he gave it. The guard went on to speak more, but Benjamin did not understand what he was saying. He could not respond or ask questions about William. Not being able to speak directly to the guard who had information about William caused Benjamin severe stress. Days later, another prison guard approached Benjamin speaking Spanish. Benjamin heard the guard say William's name and panicked because he could not understand. A fellow detained man who spoke Spanish and Mam was listening nearby. After the guard left, the man told Benjamin that William had been found. Benjamin wept tears of joy. This was the first news he had heard of William in weeks.

148.    For the next several days, officials left Benjamin with no further information about William. Officials did not explain to Benjamin where his son was or whether they would be reunited. Nor did any official ever provide a Mam interpreter such that Benjamin could ask questions about William and receive answers in a language he understood.

149.    One day, which government records suggest occurred in late June 2018, a guard called Benjamin's name. He walked over nervously. The officer led him to a room with glass windows on all four sides. Benjamin immediately noticed that there was a telephone on the table.

The officer dialed a number on the phone and handed the receiver to Benjamin. Before walking to the other side of the window wall, Benjamin understood the officer to say, in Spanish, that he had 15 minutes. When Benjamin heard William's voice on the phone, he immediately welled up with tears. He suppressed his urge to sob when he heard William weeping on the other end. William cried uncontrollably, and Benjamin tried to console him.

150.     Benjamin learned where William was for the first time—somewhere called Casa Kokopelli. ORR had transferred William to Southwest Key Program's Casa Kokopelli in Arizona weeks before, without notifying Benjamin. In what felt like far too little time, the officer came back into the room and motioned for Benjamin to hand over the phone receiver. Benjamin felt rushed and wanted more time to speak with William. He tried to tell William goodbye, but only heard his son sobbing as the officer hung up the phone.

151.     During the following months, immigration authorities allowed Benjamin and William to speak once or twice per week, for limited periods of time. Sometimes when Benjamin would get his turn to use the phone, the staff at Casa Kokopelli would not pick up. Benjamin wanted to try dialing again, at least once more, but was not permitted to do so. From what he understood, the officer would say in Spanish that Benjamin had to wait until next week. Benjamin would return to his cell, depressed.

152.     Eventually, ICE transferred Benjamin in wrist and ankle chains again, this time to Adelanto ICE Processing Center ("Adelanto") in Adelanto, California. Adelanto is operated by a private, for-profit company through a contract with ICE. At Adelanto, ICE detained Benjamin in a cell with two sets of bunk beds and three other men. Each cell had a combination toilet and sink out in the open such that Benjamin and his cellmates had no privacy when using the bathroom. The toilet was filthy to the point that the entire cell stunk of feces, day and night. Benjamin spent what felt like eight to ten hours per day locked in his cell. The guards at Adelanto turned lights out for only a few hours during the late night and early morning, but they came and went throughout the night and often shined bright lights into the faces of individuals in their cells while they slept. At mealtime, the guards did not give Benjamin sufficient food, nor enough time to eat. In the morning, the guards would wake the men up using a blaring alarm. Benjamin grew so anxious of the alarm that he started

-49-

to hear it in his sleep, making it impossible to keep his eyes closed. If Benjamin did not rush out of his room at the sound of the alarm, an official would lock the door. On those days, he would miss breakfast. Benjamin became so malnourished during his time in detention that he continued having difficulty eating upon his release.

153.    Benjamin's mental health deteriorated while detained at Adelanto. ICE never explained to Benjamin why he was being detained and kept away from his son for so many months. Nor did ICE provide Mam interpretation to allow Benjamin to ask questions about his detention or his son. Over time, his hope that he would ever see William again dwindled. Every week, he saw other people being freed from detention. For reasons unknown to Benjamin, he remained. At Adelanto, Benjamin had frequent nightmares, including dreams about his desperation to see William. Eventually Benjamin lost the will to sleep because the nightmares drained him even more than the exhaustion he felt during the day.

154.    Benjamin's waking hours were also full of anxiety. Benjamin felt that he lost the ability to control his own thoughts and his grip on reality. He began to think that his clothes were possessed with unsettled spirits of people who had worn them before him. Benjamin began to contemplate suicide because he had no idea when his situation would change and he felt that he had failed William.

**3.    Government agents detained William in linguistic isolation in ORR custody for months and refused to reunify him with Benjamin even after a court order required them to do so.**

155.    After taking William away from his father for the second time, a Border Patrol officer loaded William into a car along with another migrant child. By that point William had completely shut down. He sat crying silently in the back of the car. At some point the officer at the wheel looked back at William and the other boy and said that they were going to be with all the other children.

156.    The officer took William to Casa Kokopelli, where William entered ORR custody. Although Casa Kokopelli did not provide William with Mam interpretation, William worked up the courage to try to ask one of the staff members about Benjamin in Spanish. William noticed that the staff struggled to understand him. He had to repeat himself multiple times for officials to understand

what he was asking. For weeks, he heard nothing back. William began to feel consumed by nerves during the day. He experienced physical symptoms of anxiety, feeling his body physically trembling and at times feeling unable to hear anything around him. He often cried himself to sleep.

157.    Even after he eventually spoke to Benjamin on the phone, William grew restless to know when he would see his father again. The ten-to-fifteen-minute calls never felt like enough time. Neither Benjamin or William had received an explanation of why they were separated at all or when they would be reunited. William was often unable to control his desperate sobbing.

158.    Despite Judge Sabraw's order in *Ms. L* setting a July 26, 2018 reunification deadline for separated children over the age of five, government officials did not reunify Benjamin and William. Instead, they told William he would be reunified with his father, transported him across the country for his supposed reunification, and then sent him back to detention at Casa Kokopelli, alone.

159.    In late July 2018, a Casa Kokopelli staff member told William that he would reunite with Benjamin that week. William was overjoyed and jittering with excitement. He had been desperate to see his father for almost two months. He quickly packed his belongings. Officials arrived and escorted him to an airport. During the plane ride from Arizona to Texas, William cried tears of joy. Once he arrived in Texas, officials took William to a house where he waited with many other children who were waiting to be reunited with their parents. After a couple of days, officials loaded William and the other children onto a bus and drove for hours. William could sense the excitement of the other children to see their parents the entire drive. When the finally arrived, the size of the facility shocked William. He saw countless adults that appeared to be the parents of the migrant children. But he did not see his father.

160.    One by one, the officials called the children's names. William watched child after child reunite with their parent, but William's name was never called. He searched the large room for his father, but he could not find him. William became nervous, so he asked one of the Spanish-speaking officials that escorted him to the facility where Benjamin could be. William had to repeat himself a few times before the officer understood what he had asked. The official walked away, and came back after some time. When the official came back, he told William that Benjamin was not coming. Benjamin was still detained in California. William's heart clenched. He felt that the officials

-51-

had deceived him. William began to feel like he was physically falling. He believed he would never see his father again. As he sobbed, he started shaking so intensely that an official had to bring him a glass of water to help him breathe.

161.    After failing to reunify William and Benjamin, immigration officials put William on what appeared to be a commercial flight back to Arizona. The moment William sat in his assigned seat, he broke down. As William sobbed, he noticed that the other passengers were staring at him. He felt alone in the world. Officials took William back to Casa Kokopelli.

162.    The government did not comply with the order requiring reunification of Benjamin and William, continuing to detain them separately in federal custody well past July 26, 2018, and long after their botched attempt at reunification in Texas. ORR continued to detain William until November 2018 and ICE continued to detain Benjamin away from his son until March 2019.

### 4.    William and Benjamin were finally reunified—many months after the deadline set by court order.

163.    Eventually, Benjamin was able to secure the assistance of an attorney who used a Mam interpreter to communicate with him. Although the Mam interpreter spoke a different dialect than Benjamin, his attorney was the first person in the United States who made any effort to communicate with Benjamin in a language he understood. Otherwise, Benjamin never received information about where he was, where his son was, or what the process was for pursuing his asylum case or release from detention.

164.    In early November 2018, the government released William to family members in Oakland. No one ever explained to William why government agents had brought him to Texas months before but refused to reunify him with Benjamin. Nor did any official ever provide William with a Mam interpreter to enable him to ask questions about what was happening. Even after being released in Oakland, William worried constantly about Benjamin.

165.    After William's release, ICE stopped facilitating even brief phone calls between William and Benjamin. Benjamin, who was still detained, had to ask for money so that he could purchase phone time from the private company that operated the detention center.

COMPLAINT
Case No:

166.    On or about January 31, 2019, an asylum officer conducted a credible fear interview of Benjamin. Government records indicate that the interview was conducted with Mam interpretation and that Benjamin repeatedly asked when he would be released and be able to see his son again. On information and belief, Benjamin's credible fear interview was his first opportunity to speak to a government official through a Mam interpreter. The asylum officer conducting the interview refused to give Benjamin any information about his son or Benjamin's prospects for release. The asylum officer found that Benjamin had a credible fear of persecution.

167.    Over a month after the credible fear interview, in March 2019, ICE finally released Benjamin from custody on a $10,000 bond. ICE officials did not provide Benjamin with the address where William was living, nor any other logistical support to Benjamin in reunifying with his son. With help from his attorney and non-profit volunteers, Benjamin managed to travel to Oakland, California, where he would settle with his son. When Benjamin and William finally reunified in Oakland, they embraced and broke down into tears. William repeatedly thanked Benjamin for finally coming home.

168.    At no point were Benjamin or William charged with or convicted of a crime in the United States.

**5.    Forcible separation caused Benjamin and William severe and lasting harm.**

169.    Even after reunifying in Oakland, Benjamin and William have continued to suffer from their nearly-ten-month forcible separation. For years, nightmares about separation and detention have disrupted Benjamin's sleep. In some dreams, he repeatedly relived the moment that Border Patrol took William away. In others, he heard the alarms at Adelanto blaring. Benjamin began to isolate himself from everyone except William. He lost the will to make personal connections with others. He felt consumed by pain. Benjamin also began to experience short-term memory loss after the separation. Benjamin had not had memory issues before his separation and detention, but began to lose himself in conversation, unable to remember a statement or question even shortly after hearing it, causing him to feel confused and ashamed.

-53-

170.     In Oakland, William has experienced intrusive thoughts about being separated from his father, at times feeling like he cannot escape thinking about or remembering what happened. Although he tries not to think about it, remembering his separation from Benjamin and months of isolation makes him feel depressed and alone.

**E.     The United States violated the Constitution and multiple mandatory legal obligations when it forcibly separated the Plaintiff families during their detention.**

171.     The government had no legitimate reason to separate the Plaintiff families. *See Ms. L. v. U.S. Immigr. & Customs Enf't*, 302 F. Supp. 3d 1149, 1165 (S.D. Cal. 2018) (finding that separated plaintiff families, including those in DHS custody after conviction of a misdemeanor border crossing offense, were "victims of a wide-spread government practice" instituted for "no legitimate reason"); *M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 121 (D.D.C. 2018) ("[N]othing in federal law suggests that deterring immigration by indefinitely separating families once the parents have been transferred to immigration custody is a compelling or legitimate government objective."). Indeed, the separations and continued mistreatment that federal agents inflicted on the Plaintiff families in detention violated the United States Constitution, federal law, and mandatory federal policy. As multiple government officials recognized, the purpose of the separations was to reduce the number of asylum seekers in the United States—by coercing newly arrived asylum seekers like Plaintiffs into abandoning their lawful claims and deterring future asylum seekers from attempting to exercise their right to seek asylum in the United States out of fear that doing so would result in the loss of their children.

172.     No law or regulation required the government to separate the Plaintiff families. Nor did the government have any reason for concern that Plaintiff Parents posed any risk to Plaintiff Children, or that the Plaintiff families posed any safety or security concern whatsoever, let alone a concern requiring separation.

173.     The government violated the Constitution when it subjected the Plaintiff families to the Family Separation Policy. First, it violated their constitutional right to family integrity. The Supreme Court has consistently recognized that the parent-child relationship is constitutionally

-54-

protected, *see, e.g., Quilloin v. Walcott*, 434 U.S. 246, 255 (1978); *Wisconsin v. Yoder*, 406 U.S. 205, 231–33 (1972); *Meyer v. Nebraska*, 262 U.S. 390, 399–401 (1923), and that it is essential for children to remain with their parents, *see Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.").

174.    These constitutional protections extend to citizens and non-citizens alike, even when confined by the government. *Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enforcement*, 319 F. Supp. 3d 491, 500 (D.D.C. 2018). Indeed, the court in *Ms. L* held that the Family Separation Policy under which the government separated the Plaintiff families violated this longstanding constitutional right. *See* 310 F. Supp. 3d at 1144–46 ("A practice of this sort implemented in this way is likely to be 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience,' . . . interferes with rights 'implicit in the concept of ordered liberty[,]' . . . and is so 'brutal and offensive that it [does] not comport with traditional ideas of fair play and decency.'" (internal quotation marks omitted and cleaned up)); *see also C.M. v. United States*, 2020 WL 1698191, at *4 (D. Ariz. Mar. 30, 2020) (finding plaintiffs in a Family Separation case had "plausibly alleged that the government's separation of their families violated their constitutional rights").

175.    In addition to violating the Plaintiff families' constitutional rights when it separated them, government officials also violated the constitutional rights of Plaintiffs Eduardo I.T., Edwin E.I.I., Benjamin J.R., and William A.J.M. by failing to reunify them by the July 26, 2022 court-ordered deadline set in *Ms. L*, 310 F. Supp. 3d at 1149.

176.    By separating the Plaintiff families, CBP violated mandatory policies set forth in the U.S. Customs and Border Protection National Standards on Transport, Escort, Detention, and Search ("TEDS"), which "govern[s] CBP's interaction with detained individuals."[78] TEDS implements "key

---

[78] *See* Customs and Border Protection, National Standards on Transport, Escort, Detention, and Search 2015 [hereinafter TEDS] at 4 *available at* https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf.

regulatory and legal requirements" for CBP. TEDS at 4. "CBP will maintain family unity to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that requires separation." *Id.* at 5.

177.    In addition to preserving family unity, CBP agents had a duty to "consider the best interest of the juvenile at all decision points beginning at the first encounter and continuing through processing, detention, transfer, or repatriation." TEDS at 4. Given the well-documented damage that separation from their parents would cause to Plaintiff Children, CBP agents violated this duty when they separated the Plaintiff families and failed to make even basic efforts toward their reunification.

178.    During the Plaintiff families' separation and detention, federal agents subjected them to harsh and cruel treatment in custody, in violation of the United States Constitution and multiple mandatory federal policies.

179.    The Constitution mandates that the government meet the basic human needs for sleep, food, water, sanitation, medical care, and reasonable safety of anyone in custody. *See, e.g., Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Thomas v. Baca*, 514 F. Supp. 2d 1201, 1216 (C.D. Cal. 2007) (in more restrictive criminal custody context, "requiring inmates to sleep on the floor deprives them of a minimum measure of civilized treatment and access to life's necessities because access to a bed is an integral part of the 'adequate shelter' mandated by the Eighth Amendment"). These standards apply to civil detention in Border Patrol's *hieleras*, where the Plaintiff families were detained and separated. *Doe v. Kelly*, 878 F.3d 710, 725 (9th Cir. 2017) (upholding preliminary injunction requiring improvements to conditions in *hieleras* in Arizona); *Unknown Parties v. Nielsen*, --- F. Supp. 3d ----2020 WL 813774, at *19-22 (D. Ariz. Feb. 19, 2020) (entering permanent injunction requiring improvements in certain Arizona *hieleras* on constitutional grounds). The conditions of confinement to which Border Patrol subjected the Plaintiff families in the *hielera* where they were detained, described in detail above, violated these longstanding constitutional standards.

180.    The conditions to which Border Patrol subjected the Plaintiff families in the *hieleras* also violated numerous mandatory, non-discretionary obligations set forth in Border Patrol policy in place at the time. For example,  on "Food," TEDS mandates that "[f]ood provided must be in edible

condition." TEDS at 18. Border Patrol agents repeatedly served inedible, uncooked ramen noodles to Plaintiffs in direct violation of these policies. TEDS also requires that that "[f]unctioning drinking fountains or clean drinking water along with clean drinking cups must always be available to detainees." *Id.* Border Patrol's failure to provide clean water and drinking cups to the Plaintiff families violated this directive.

181. Under TEDS, "[a]ll instructions and relevant information must be communicated to the detainee in a language or manner the detainee can comprehend." TEDS at 4. Yet, as described in detail above, Border Patrol officials consistently failed to communicate with the Plaintiff families in the languages they understood and refused to translate English-language documents that they coerced Plaintiff Parents to sign, all in violation of mandatory policy. CBP agents also failed to ascertain—or simply ignored— that Plaintiffs Eduardo I.T., Ignacio P.G., Leonel Y.P.G., Benjamin J.P., and William A.J.M. lacked sufficient proficiency in Spanish to receive critical information in that language, and failed to provide interpretation into Q'eqchi' or Mam.

182. In subjecting Plaintiff Children in particular to inhumane and unsafe conditions in CBP *hieleras,* where government agents held them in unsanitary cells and deprived them of adequate food, clean drinking water, adequate bedding, and sufficient space to sleep, the government violated federal law and policy requiring that minors be held in "facilities that are safe and sanitary," and that account for "the particular vulnerability of minors."[79]

183. The Family Separation Policy artificially and disingenuously increased the number of UACs in ORR custody by intentionally separating accompanied children, like Plaintiff Children, from their parents. However, the government failed to prepare for the exponential increase in children ORR would need to detain as a result.[80] ORR was particularly unprepared for "tender age" children under 12, like Leonel. As a result, the government ignored applicable child welfare standards in violation of its mandatory duties.

---

[79] *Flores v. Reno*, Stipulated Settlement Agreement ¶ 12.A, No. 85-CV-4544 (C.D. Cal. Jan. 17, 1997); *see also* U.S. Customs & Border Prot., *U.S. Border Patrol Policy: Hold Rooms and Short Term Custody* (2008); *Flores v. Barr*, 934 F.3d 910, 916 (9th Cir. 2019).
[80] U.S. Dep't of Health & Human Servs., Off. of Inspector Gen., OEI-BL-18-00511, Separated Children Placed in Office of Refugee Resettlement Care 3 (2019), https://oig.hhs.gov/oei/reports/oei-BL-18-00511.pdf. at 6.

COMPLAINT
Case No:

184.    For example, the government detained Plaintiffs Leonel and William in near-total linguistic isolation for nearly two months, despite the requirement that services be provided "in a manner which is sensitive to the … native language and the complex needs of each minor."[81]

185.    The government had no discretion to implement the Family Separation Policy, as it violated binding obligations under the United States Constitution, court orders, and agency standards.

## CAUSES OF ACTION

The Federal Tort Claims Act allows plaintiffs to sue the United States in tort in accordance with the law of the place where the tortious act or omission took place.  28 U.S.C. 1346(b)(1).  The Counts herein are alleged under the applicable laws of Arizona, Texas, New Mexico, and California, according to proof at trial and without waiving the right to allege claims under the laws of additional states if Plaintiffs discover facts during the course of this action warranting such addition.

## COUNT 1—INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### *(All Plaintiffs)*

186.    All prior allegations are incorporated as though set forth fully herein.

187.    By engaging in the acts described in this Complaint, the federal officers and officials referenced above engaged in extreme and outrageous conduct with an intent to cause, or a reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress.

188.    As a direct and proximate result of that conduct, Plaintiffs suffered severe emotional distress.  Plaintiffs suffered such severe emotional distress as a direct and proximate result of both the conduct aimed at them personally, and also the conduct aimed at their separated close family member.

189.    Under the FTCA, the United States is liable to Plaintiffs for intentional infliction of emotional distress.

## COUNT 2—NEGLIGENCE

### *(All Plaintiffs)*

---

[81] *Flores v. Reno*, Stipulated Settlement Agreement Ex. 1 ¶ B, No. 85-CV-4544 (C.D. Cal. Jan. 17, 1997).

-58-

190.    All prior allegations are incorporated as though set forth fully herein.

191.    The federal employees referenced above had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause unnecessary harm or injury. The federal employees also had mandatory duties of care, including but not limited to those imposed by the United States Constitution, the *Flores* Agreement, and agency standards and regulations. By engaging in the acts alleged herein, these federal employees failed to act with ordinary care and breached additional duties of care owed to Plaintiffs. The federal employees referenced herein also failed to aid against unreasonable illness or injury while Plaintiffs were in federal custody.

192.    As a direct and proximate result of the referenced conduct, Plaintiffs suffered substantial damages.

193.    Under the FTCA, the United States is liable to Plaintiffs for negligence.

## COUNT 3—ABUSE OF PROCESS

*(All Plaintiffs)*

194.    All prior allegations are incorporated as though set forth fully herein.

195.    In the separation and detention of Plaintiffs, the government wielded its detention authority, which is a willful act within and incident to the judicial process of removal proceedings, for improper ulterior motives, including forcibly separating Plaintiffs and other families in order to generate publicity and deterring Plaintiffs and other families from asserting their rights, protected by both U.S. and international law, to seek asylum in the United States.  Such detention and separation constituted illegal, improper, and/or perverted use of process neither warranted nor authorized by the law. As a direct result of this conduct, Plaintiffs suffered harm.

196.    Under the FTCA, the United States is liable to Plaintiffs for abuse of process.

## COUNT 4—NEGLIGENT SUPERVISION/BREACH OF FIDUCIARY DUTY

*(All Plaintiffs)*

197.    All prior allegations are incorporated as though set forth fully herein.

198.    The government, having decided to separate the Plaintiff Children from Plaintiff Parents, assumed a fiduciary duty to care for the children.

199.    The government breached this duty to Leonel Y.P.G. and William A.J.M. by failing

to provide them with adequate Mam interpretation. The government, having seized and separated Leonel and William from their fathers, had a duty to ascertain their native language and provide interpretation into that language. On information and belief, in the Arizona facility the government provided some services and communicated with children in Spanish but failed to provide such services to Leonel or William and failed to communicate with them in Mam, further isolating them and exacerbating their feelings of emotional distress.

200.    The government breached its fiduciary duty as to all Plaintiffs by committing the other acts and omissions affecting the Plaintiff Children while they were under the custody and care of Defendant, as stated above and incorporated as if fully set forth herein.

201.    Under the FTCA, the United States is liable to Plaintiffs for negligent supervision and breach of fiduciary duty.

## COUNT 5—LOSS OF CONSORTIUM

*(All Plaintiffs)*

202.    All prior allegations are incorporated as though set forth fully herein.

203.    All Plaintiffs suffered a loss of society, companionship, care, support, and affection of a close familial relationship as a result of Defendants' commission of the torts alleged in this Complaint. For example, as a result of the government's intentional infliction of emotional distress and abuse of process, all Plaintiffs were separated from a close family member, either a parent or child, while detained in a foreign country. Under these circumstances, any person would seek familial companionship, care, support, and affection, yet Plaintiffs could not do so because the government had separated the sons from their fathers.

204.    The government's intentional and negligent misconduct, which caused general chaos and prevented families from communicating, also deprived Plaintiffs of the ability to seek comfort in each other.  This harm was a foreseeable result of the government's actions and omissions.

205.    Even after reunification, the effects of the separation have continued to deprive Plaintiff Parents of the companionship of the Plaintiff Children, and vice-versa, having undermined Plaintiffs' parent-child (or child-parent) relationships with each other

206.    Under the FTCA, the United States is liable to Plaintiffs for loss of consortium.

1

## **COUNT 6—INTENTIONAL INTERFERENCE WITH CUSTODIAL RELATIONS**

2

*(All Plaintiffs)*

3      207.    All prior allegations are incorporated as though set forth fully herein.

4      208.    Knowing that Plaintiff Parents did not consent, the government abducted and

5  compelled Plaintiff Children, who were then minors, to leave the care and custody of Plaintiff

6  Parents, who were legally entitled to custody. The government intended to deprive Plaintiff Parents

7  of custody over Plaintiff Children, without Plaintiff Parents' consent, for the express purpose of

8  causing them harm.

9      209.    As a direct and proximate result of the government's conduct, Plaintiffs suffered

10  severe emotional trauma and substantial damages.

11      210.    Under the FTCA, the United States is liable to Plaintiffs for intentional interference

12  with custodial relations.

13

## **PRAYER FOR RELIEF**

14      Plaintiffs respectfully pray that this Court assume jurisdiction over this action and issue a

15  judgment granting Plaintiffs:

16      A.    Compensatory damages;

17      B.    Punitive damages;

18      C.    Attorneys' fees and costs as allowable by law, including by the Equal Access to

19  Justice Act, 28 U.S.C. § 2412; and

20      D.    Such other and further relief as the Court deems just.

21

22

23

24

25

26

27

28

COMPLAINT
Case No:

1

## DEMAND FOR JURY TRIAL

2          FTCA claims are tried to the bench. 28 U.S.C. § 2402. Plaintiffs demand a jury trial on any

3   claims that are, at the time of trial, triable by jury, whether because of a change of law or an

4   amendment to the pleadings.

5

6   Dated:  September 20, 2022                          PILLSBURY WINTHROP SHAW
                                                        PITTMAN LLP
7

8                                                       /S/ DUSTIN CHASE-WOODS
9                                              By:      BLAINE I. GREEN
                                                        DUSTIN CHASE-WOODS
10

11                                                      LAWYERS' COMMITTEE FOR CIVIL
                                                        RIGHTS OF THE SAN FRANCISCO
12                                                      BAY AREA

13                                                      BREE BERNWANGER
                                                        VICTORIA PETTY
14

15                                                      Attorneys for Plaintiffs Eduardo I.T.; Edwin
                                                        E.I.I.; Ignacio P.G.; Leonel Y.P.G., a minor
16                                                      child; Benjamin J.R.; and William A.J.M.

17

18

19

20

21

22

23

24

25

26

27

28

-62-