PILLSBURY WINTHROP SHAW PITTMAN LLP
BLAINE I. GREEN (SBN 193028)
blaine.green@pillsburylaw.com
DUSTIN CHASE-WOODS (SBN 318628)
dustin.chasewoods@pillsburylaw.com
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Telephone:      415.983.1000
Facsimile:       415.983.1200

LAWYERS' COMMITTEE FOR CIVIL RIGHTS
OF THE SAN FRANCISCO BAY AREA
BREE BERNWANGER (SBN 331731)
bbernwanger@lccrsf.org
VICTORIA PETTY (SBN 338689)
vpetty@lccrsf.org
131 Steuart Street #400
San Francisco, CA 94105
Telephone: 415.814.7631

Attorneys for Plaintiffs Eduardo I.T.; Edwin E.I.I.;
Ignacio P.G.; Leonel Y.P.G., a minor child;
Benjamin J.R.; and William A.J.M.

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA - OAKLAND DIVISION

| | |
|---|---|
| EDUARDO I.T., EDWIN E.I.I., Ignacio P.G., Leonel Y.P.G., a minor child, Benjamin J.R., and William A.J.M.<br><br>        Plaintiffs,<br><br>   vs.<br><br>UNITED STATES OF AMERICA<br><br>        Defendant. | Case No. 4:22-cv-05333-DMR<br><br>**STATEMENT OF RECENT DECISION RE: PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER AND MOTION TO DISMISS**<br><br>Date: January 26, 2023<br>Time: 1:00 PM<br>Dept: Courtroom 4 (By Zoom)<br>Judge: Hon. Donna M. Ryu<br>Trial Date: Not set |

Pursuant to Civil Local Rule 7-3(d)(2), in connection with its Opposition to Defendant's Motion to Transfer and Motion to Dismiss ("Opposition"), Plaintiffs hereby respectfully call the Court's attention to the January 9, 2023 order denying defendant's motion to transfer and granting in part and denying in part defendant's motion to dismiss in *K.O. by and through E.O. v. United States*, No. 4:20-12015-TSH, 2023 WL 131411 (D. Mass. Jan. 9, 2023), which was issued after Plaintiffs' Opposition was due and filed (on December 23, 2022). A copy of the order in *K.O.* is attached as Exhibit A.

DATED:       January 19, 2023                    /s/ *Dustin Chase-Woods*
                                                 DUSTIN CHASE-WOODS

                                                 *Attorneys for Plaintiffs Eduardo I.T.; Edwin E.I.I.; Ignacio P.G.; Leonel Y.P.G., a minor child; Benjamin J.R.; and William A.J.M.*

# Exhibit A

2023 WL 131411
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

K.O., BY AND THROUGH their parents and next friends, E.O. and L.J., E.O. Jr., by and through their parents and next friends E.O. and L.J., E.O. and L.J., in their personal capacity, C.J., by and through his father and next friend F.C., F.C., in his personal capacity, Plaintiffs,
v.
UNITED STATES of America, Defendant.

CIVIL ACTION NO. 4:20-12015-TSH
|
Signed January 9, 2023

**Attorneys and Law Firms**

David A. Vicinanzo, Pro Hac Vice, Nathan P. Warecki, Nixon Peabody LLP, Manchester, NH, Howard M. Cooper, Joseph M. Cacace, Todd & Weld, Boston, MA, Lauren Maynard, Nixon Peabody LLP, Boston, MA, Derege B. Demissie, Susan B. Church, Demissie & Church, Cambridge, MA, for Plaintiffs.

Michael P. Sady, Rayford A. Farquhar, United States Attorney's Office, Boston, MA, for Defendant.

## ORDER AND MEMORANDUM ON DEFENDANT'S MOTION TO TRANSFER OR IN THE ALTERNATIVE MOTION TO DISMISS (Docket No. 50)

HILLMAN, DISTRICT JUDGE

**\*1** K.O., E.O. Jr., L.J., E.O., C.J. and F.C. ("plaintiffs") bring a suit against the United States of America ("defendant") under the Federal Tort Claims Act ("FTCA"), alleging various common law torts [1] arising from the separation of noncitizen families who crossed the southern border of the United States. For the reasons below, the Court ***denies*** defendant's motion to transfer, and ***grants*** in part and ***denies*** in part their motion to dismiss.

## Background

### 1. Flores and Immigration Law

In 1997 the United States entered into a settlement agreement ("*Flores* settlement") concerning the treatment of noncitizen children. (Am. Comp. at ¶ 27). That agreement set the rules for detaining noncitizen minors, including policies encouraging immigration authorities to release minors whenever possible and place minors in the "least restrictive setting." (*Id.* at ¶¶ 28-31). Although the *Flores* settlement was intended as a stopgap measure, and there are some statutes concerning the detention of minor noncitizens (discussed below), both parties agree the agreement is still in effect. *See also* Bunikyte ex rel. Bunikiene v. Chertoff, No. 07-ca-164-SS, 2007 WL 1074070, at \*2-\*3 (W.D. Tex. Apr. 9, 2007).

In 2008 Congress passed the Trafficking Victims Prevention Reauthorization Act ("TVPRA"). P.L. 110-457 (Dec. 23, 2008). Under that act, an "Unaccompanied alien child" ("UAC") is a child under 18 with no lawful immigration status and no parent or legal guardian available to care for them in the United States. 6 U.S.C. § 279. Furthermore, "[e]xcept in the case of exceptional circumstances," minor noncitizens can only be detained for more than 72 hours before being transferred to the custody of Health and Human Services (here, the Office of Refugee Resettlement, "ORR"). 8 U.S.C. § 1232(b)(3).

### 2. The Policy

The plaintiffs allege that, beginning in 2017, the Trump administration instituted a new policy of separating noncitizen families that crossed at the southern border. (Am. Comp. at ¶¶ 36-43). They allege the policy began in earnest in late 2017 and was implemented regardless of the factual circumstances of the family in question. (*Id.* at ¶¶ 47-48). During separation, parents were not allowed to speak with their children. (*Id.* at ¶ 58). Reunification was complicated by the decision to label the children as "unaccompanied," (*id.* at ¶ 64).

**\*2** The policy was escalated in April 2018 when the Trump administration announced a "Zero Tolerance policy" for illegal border crossings whereby all noncitizens would

be detained and referred for prosecution. (*Id.* at ¶¶ 68-70). The plaintiffs allege the policy was a pretext for a policy of separation that occurred both before and after the "Zero Tolerance" announcement and occurred even when there was no prosecution. (*Id.* at ¶¶ 71-79).

Plaintiffs argue that this policy was motivated by animus toward noncitizens and immigration generally and was designed to deter immigration—at least via the southern border—pointing to public remarks by senior Trump administration officials. (*Id.* at ¶¶ 80-101). Plaintiffs argue that the officials were aware of the trauma that children would suffer but failed to provide adequate mental health care. (*Id.* at ¶¶ 102-18). They also argue that many parents were forced to waive their rights to apply for asylum in return for reunification. (*Id.* at ¶¶ 119-23)

### 3. The Plaintiffs

#### a. E.O., L.J., E.O. Jr., and K.O.

This family ("Family O") resides in Massachusetts. (*Id.* at ¶ 12). They are seeking asylum and fleeing violence and persecution in Guatemala. (*Id.*). K.O. is a minor and E.O., Jr. was a minor when the complaint was filed. (*Id.* at ¶ 10). L.J. is the mother and E.O. is the father of the children. E.O. was living in Massachusetts when his family crossed the border. (*Id.* at ¶ 143).

On May 19, 2018, L.J., E.O. Jr., and K.O. entered Texas from Mexico. (*Id.* at ¶ 127). They crossed into the Southern District of Texas. (Docket No. 61, at 4 n. 4).[2] After being apprehended by a Customs and Border Protection Agent ("CBP"), they were brought to a detention agency. (Am. Comp. at ¶¶ 130-32). Both children were taken from their mother and questioned. (*Id.* at ¶¶ 133-35). K.O., the younger child, was brought back to her mother and they were kept in a cell for 12-14 hours. (*Id.* at ¶¶ 136-38). At that point, K.O. was forcibly separated from her mother. (*Id.* at ¶¶ 138-41). L.J. was never charged with a crime, nor were there allegations of abuse or neglect. (*Id.* at ¶ 145).

The day the children were separated, a CPB or Immigration and Customs Enforcement ("ICE") officer called E.O., the father, and told him his children were in custody, separate from their mother, and would be placed in the custody of a social worker. (*Id.* at ¶ 144).

On May 20, 2018, E.O. received a Family Reunification Application and began the process of trying to reunite with his family; the process dragged on due to interviews and errors in the documentation. (*Id.* at ¶¶ 164-65). As a condition of receiving custody of his children E.O. had to attend a presentation directed toward guardians of unaccompanied minors. (*Id.* at ¶ 166).

Shortly thereafter, the children of Family O were reunited and brought to a different facility in separated cells that faced each other. (*Id.* at ¶ 146). They spent two days in that facility and were not allowed to speak to each other and only had access to thermal blankets. (*Id.* at ¶¶ 147-49). The children in the facility were not supervised, there was no support for children as young as two or three years of age, the guards verbally abused the children when they cried, and one guard kicked E.O. Jr. (*Id.* at ¶¶ 150-53).

**\*3** After two days, the children were taken to another facility; on the way, CPB or ICE agents told E.O., Jr. his mother had been deported. (*Id.* at ¶¶ 156). At some point, the two children were taken to Michigan and told they would be separated, but federal agents told E.O. Jr. his mother would arrive in the morning. (*Id.* at ¶ 157). K.O. was brought to a foster family with three other children who had been separated and spoke with her father every night. (*Id.* at ¶¶ 158-59). E.O. Jr. was in a facility with eighteen other boys and attended school in the morning where he could see K.O. (*Id.* at ¶ 160). During this period the children were vaccinated, despite already being vaccinated, and not told where their mother was. (*Id.* at ¶ 161-62). The children were reunited with their father on June 19, 2018, having flown from Michigan to the District of Columbia, to Boston. (*Id.* at ¶ 166).

During this time L.J. remained detained in Texas and was not able to call her husband for nine days. (*Id.* at ¶168). After she was found to have a credible fear of prosecution, (*Id.* at ¶ 169), L.J. was released on June 26, 2018, and reunited with her family shortly thereafter, (*Id.* at ¶ 170). K.O. and E.O., Jr. were separated from both parents for 31 days and from their mother for 38 days. The family is traumatized by the ordeal, especially the children. (*Id.* at ¶¶ 171-72).

#### b. F.C. and C.J.

This family ("Family C") resides in Massachusetts. (*Id.* at ¶ 12). They are seeking asylum and fleeing violence and

persecution in Guatemala. (*Id.*). F.C. is C.J.'s father. Family C entered Texas on June 17, 2018, from Mexico. (*Id.* at ¶ 174). They crossed into the Western District of Texas. (Docket No. 67, at 4). They were apprehended by CBP, detained, and told they would be separated. (Am. Comp. at ¶¶ 175-76). While detained, they were given an aluminum blanket to share and were cold and hungry. (*Id.* at ¶ 177-78).

On June 20, 2018, CPB agents told F.C. he had to leave his son in the facility while he attended court for the day and did not make it clear they were being separated. (*Id.* at ¶ 179). Instead, F.C. was held in an unidentified facility, possibly a prison or jail, then moved to another facility. (*Id.* at ¶ 181-85). F.C. spent three weeks with pending criminal charges before they were dismissed and was then moved to various immigration detention facilities. (*Id.* at ¶ 185). After several weeks an employee allowed F.C. to use a phone and contact his son. (*Id.* at ¶¶ 185-86). While his father was detained, C.J. was kept in a facility with other children separated from their families. (*Id.* at ¶¶ 189-91). They were reunited at an immigration detention facility on July 26, 2018. (*Id.* at ¶ 192). Not including the time apparently spent in criminal detention, C.J. and F.C. were separated for 15 days. Both father and son are traumatized by the ordeal. (*Id.* at ¶¶ 192-96).

## Analysis

*1. Motion to Transfer*

Defendant moves to transfer the case to the Western District of Texas. In this district, courts consider a six-factor test when deciding a motion to transfer:

> (1) the plaintiff's choice of forum, (2) the relative convenience of the parties, (3) the convenience of the witnesses and location of documents,[3] (4) any connection between the forum and the issues, (5) the law to be applied, and (6) the state or public interests at stake.

*ViaTech Techs., Inc. v. Adobe Inc.*, No. 19-cv-11177-ADB, 2020 WL 1235470, at *2 (D. Mass. Mar. 13, 2020). The burden of proof is on the party seeking transfer and there is a strong presumption in favor of the plaintiffs' choice of forum. *Coady v. Ashcraft & Gerel*, 223 F.3d 1, 11 (1st Cir. 2000).

Courts in this district have held the strong presumption created in the first factor is weakened if the operative facts did not occur in the state, *Wadhams v. American Fed'n of Teachers*, No. 19-cv-12098-LTS, 2020 WL 3129480, at *3 (D. Mass. June 12, 2020),[4] and other circuits have held it is less important if the action is a class action, *In re Warrick*, 70 F.3d 736, 741 n. 7 (2d Cir. 1995). However, cases brought under the FTCA can be brought either in a plaintiff's home district or in the district "where the act or omission occurred." 28 U.S.C. § 1402(b). This reflects a policy choice Congress made to not force individuals to travel outside their home district to bring FTCA suits. Defendant's theory would mean that the United States could transfer almost any FTCA suit away from the plaintiff's home district to the district where the acts occurred, undermining that policy. A review of motions to transfer in FTCA suits shows such transfers are rare. This Court will not penalize a plaintiff in an FTCA suit for suing in their home district. Furthermore, this Court declines to adopt the reasoning in *Warrick*. This factor strongly favors the plaintiffs.

*4 The relative convenience of the parties also strongly favors the plaintiffs. The defendant does not contend the plaintiffs would find Texas convenient. And the defendant —the United States—cannot contend Massachusetts is inconvenient. The inconvenience of federal agents is considered in the witness analysis, not the party analysis, because they are not defendants.

The relative convenience of the witnesses is often the most important factor. *First State Ins. Co. v. XTRA Corp.*, 583 F. Supp. 3d 313, 319 (D. Mass. 2022). But it primarily concerns witnesses who will need to be compelled. *Mateo v. Univ. Sys. of N.H.*, No. 18-cv-11953-FDS, 2019 WL 199890, at *9 (D. Mass. Jan. 14, 2019). Neither side has identified witnesses, though this is not a barrier to the Court making an educated guess as to which state will be more convenient. *First State*, 583 F. Supp. 3d at 319. The witnesses will likely include federal personnel from Texas, Michigan, and possibly to the District of Columbia. Insofar as they are employees and can be compelled to come to Massachusetts by their employer, defendant cannot claim they are inconvenienced. *Rosenthal v. Unum Grp.*, No. 17-40064-TSH, 2018 WL 1250483, at

*2 (D. Mass. Mar. 12, 2018). While some personnel may no longer work for the government and will have to be compelled it is not clear Massachusetts is less convenient for those officials than Texas because it is not clear where they live. Furthermore, witnesses might include other non-citizens who were detained with the plaintiffs, who could be anywhere in the country. This factor supports neither side.

The connection between the forum and the issues goes to the defendant, as most events occurred in Texas and Texas law will likely figure largely in the case (though Michigan and possibly District of Columbia law will also be applied). However, this was not a local issue. *Contra, e.g., United States ex rel. Ondis v. City of Woonsocket*, 480 F. Supp. 2d 434, 438 (D. Mass. 2007) (a case concerning purely Rhode Island issues). These were federal personnel implementing federal policy. This Court is competent to apply any state's law. This factor only slightly weighs in favor of the defendant.

The public interest does not favor transfer. Neither party has presented any information about relative court congestion or similar issues. But more importantly, there is no other district —other than perhaps the District of the District of Columbia —that this case can be transferred to in whole. The alleged torts against Family O occurred in the Southern District of Texas and Michigan. The alleged torts against Family C occurred in the Western District of Texas. A transfer can only occur if the action could have originally been brought in the transferee district. 28 U.S.C. § 1404(a). This Court will not duplicate the cases being litigated by transferring some of the plaintiffs but not all of them. The motion to transfer is *denied*.

*2. Timeliness of parents' claims
brought in their personal capacity*

The defendant moves to dismiss the parents' claims made in their personal capacity as untimely. This aspect of their 12(b)(1) motion should be treated as a 12(b)(6) motion because the statute of limitations in the FTCA is not jurisdictional. *Morales-Melecio v. United States*, 890 F.3d 361, 367 (1st Cir. 2018). In evaluating a Rule 12(b)(6) motion, the Court must determine "whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiff[ ], the complaint states a claim for which relief can be granted." *Cortés-Ramos v. Martin-Morales*, 956 F.3d 36, 41 (1st Cir. 2020) (quoting *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7 (1st Cir. 2011)). The complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679, 129 S.Ct. 1937.

*5 Claimants in FTCA suits must submit administrative complaints to the United States before suing, which allows the United States to screen complaints and offer settlement. 28 U.S.C. § 2675(a). Claimants may not amend their administrative claims after they have filed suit or after there is a final agency action on the administrative complaint. 28 C.F.R. § 14.2(c). A denial—a final agency action—is inferred if the United States does not reply to a complaint within six months. 28 U.S.C. § 2675(a). Failure to properly present these claims may lead to a dismissal of the suit. *Holloway v. United States*, 845 F.3d 487, 489–93 (1st Cir. 2017) (failing to indicate a "sum certain" on the administrative complaint is grounds for dismissal); *Coska v. United States*, 114 F.3d 319, 322-23 (1st Cir. 1997) (same).

On October 9, 2018, the plaintiffs filed their initial administrative complaint with the government only on behalf of their children. (Am. Comp. at ¶ 212); (Am. Comp. at Exhibit 10, at 2-3). In response to the government's reply, which alleged deficiencies in the initial complaint, they re-filed a complaint on March 13, 2020. (Am. Comp. at ¶ 212); (Am. Comp. at Exhibit 10, at 2-3). Finally, plaintiffs amended their complaint on July 7, 2021, to include the parents' claims made in their personal capacity. (Am. Comp. at ¶ 212); (Am. Comp. at Exhibit 10, at 2-3).

The government did not respond to the plaintiffs' March 13, 2020 administrative complaint. (Am. Comp. at ¶ 212). Therefore, that complaint was denied on September 13, 2020. 28 U.S.C. § 2675(a). The plaintiffs attempted to amend their administrative complaint on July 7, 2021, after instituting a suit *and* after a final agency action. Therefore, the July 7, 2021 amended administrative complaint is not properly filed and those claims are not proper grounds for a suit.

In addition, the new claims are outside the statute of limitations. However, the plaintiffs argue that the claims are

governed by the liberal Rule 15(c) standard for amending that allows parties to add claims that relate to the same transaction or occurrence. But in FTCA cases, allowing plaintiffs to add new parties after bringing suit would allow them to circumvent the administrative process described above, preventing the United States from conducting settlement negotiations in good faith. *McKenzie v. United States*, No. 1:21-CV-00233-NT, 2022 WL 2073373, at *4 (D. Me. Jun. 9, 2022). This Court follows other circuits in finding that plaintiffs may not amend their complaints in FTCA suits such that there is a "material change" that would significantly affect the pre-suit settlement calculus. *Lee v. United States*, 980 F.2d 1337, 1340-41 (10th Cir. 1992); *Manko v. United States*, 830 F.2d 831, 840-42 (8th Cir. 1987). That approach is consistent with the reasoning in *Holloway* and *Coska* regarding the importance of properly presenting administrative claims so that the United States can engage in good faith settlement negotiations. Adding three parties is a material change and therefore barred.

The plaintiffs argue that, even if their claims are outside the period of the statute of limitations, they are subject to equitable tolling, citing fears of retaliation. This Court credits those fears, which is why it allowed the plaintiffs to proceed pseudonymously. (Docket No. 71). But they have provided no reason why bringing claims in their personal capacity increases the chance of retaliation when they have already brought claims in their representative capacity. The motion to dismiss the parents' claims brought in their personal capacity is *granted*.

*3. Motion to Dismiss for Lack of Subject Matter Jurisdiction*

**\*6** The defendant also moves to dismiss for lack of subject matter jurisdiction, arguing the alleged conduct does not fall under the FTCA's waiver of sovereign immunity. The burden is on the party asserting jurisdiction—the plaintiffs. *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995). However, because the defendant does not contest the alleged facts, the standard of review is "essentially the same as a Rule 12(b)(6) analysis": the Court accepts the facts as given and determines whether jurisdiction is "plausible." *Cebollero-Bertran v. P.R. Aqueduct & Sewer Auth.*, 4 F.4th 63, 69 (1st Cir. 2021). However, a waiver of sovereign immunity should be construed narrowly. *Reyes-Colón v. United States*, 974 F.3d 56, 60 (1st Cir. 2020). The defendant argues the alleged conduct fits into two exceptions to the broad waiver of sovereign immunity found in the FTCA and that there is no "private person analogue" for the conduct.

*a. Due Care Exception*

FTCA claims are barred if they are "based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid." 28 U.S.C. § 2680(a). This is referred to as the "Due Care Exception" ("DCE") to the FTCA's waiver of sovereign immunity. The DCE only applies to regulations and statutes, not policies. *Hydrogen Tech. Corp. v. United States*, 831 F.2d 1155, 1160 n. 5 (1st Cir. 1987). The statute or regulation must "specifically [prescribe] a course of action for an officer to follow." *Welch v. United States*, 409 F.3d 646, 652 (4th Cir. 2005). And the officer must exercise due care in implementing that statute. *Id.*

The defendant argues their officers were implementing the TVPRA which requires UACs to be transferred to the custody of ORR with 72 hours. The defendant argues: (1) having made the decision to refer the parents for criminal prosecution, (2) the parents needed to be put in secure immigration detention facilities separate from their children, (3) at which point the children became unaccompanied, and (4) the TVPRA became binding.

The problem with defendant's syllogism is (2): the children were *already separated* before the TVPRA became relevant. The TVPRA might mandate a transfer to ORR after that initial separation, but the government cannot hide behind the DCE when it triggers a statutory scheme with conduct not mandated by the statute. Furthermore, nothing in the TVPRA forbids communication or the relay of accurate information about a parent's whereabouts to a child. Therefore, the DCE does not apply to the alleged conduct.

*b. Discretionary Function Exception*

The Discretionary Function Exception ("DFE") to the FTCA's waiver of sovereign immunity shields the United States from tort liability arising from its officers' discretionary acts. To determine if the DFE applies, the Court must identify the conduct that caused the harm, regardless of

the legal claims the plaintiffs bring. *Fothergill v. United States*, 566 F.3d 248, 252-53 (1st Cir. 2009). Other than the harms from the assault and battery claims, discussed separately, the harms flow from separating the families and the lack of information or communication afforded to them during the separation. The harm does not concern other conditions of confinement. The Court must determine if the conduct was discretionary.

That analysis is split into two prongs. In the first prong, plaintiffs must point to a statute, regulation, or policy directs a certain course of action. *Reyes-Colón*, 974 F.3d at 58. If the relevant authority either forbids or mandates the alleged conduct the DFE does not apply because the conduct is not discretionary. If the plaintiff cannot point to a statute, regulation, or policy, they must prevail on the second prong, which asks whether the conduct is susceptible to policy analysis. *Hajdusek v. United States*, 895 F.3d 146, 150 (1st Cir. 2018).

### i. The DFE and the TVPRA

**\*7** The plaintiffs argue that the government had no discretion to classify the children as UACs under the TVPRA. The TVPRA defines a UAC as a noncitizen with no parent or legal guardian available to care for them in the United States.

With regard to Family O, E.O. was living in Massachusetts and available to care for his children. Therefore, his children were never UACs because there was always a parent available to care for them. *D.J.C.V. v. United States*, No. 20-cv-5747-PAE, ––– F.Supp.3d ––––, ––––, 2022 WL 1912254, at \*26 (S.D.N.Y. June 3, 2022). The ORR has no authority to detain non-UACs. *Maldonado v. Lloyd*, No. 18-cv-3089-JFK, 2018 WL 2089348, at \*5-\*6 (S.D.N.Y. May 4, 2018). And, under the TVPRA other officers may not indefinitely detain noncitizen juveniles. 8 U.S.C. § 1232(b)(3). Therefore, no officer had discretion to hold the children of Family O in custody. Of course, it may take some amount of time to locate the custodian, confirm they are the legal custodian of the children, and transport the children to them. However, E.O. alleges he received an application for reunification one day after his family crossed the southern border, thus the United States was clearly aware of his relationship with these children and they treated him as a *possible* custodian, rather than what he was—their *actual* custodian. *D.J.C.V.*, ––– F.Supp.3d at ––––, 2022 WL 1912254, at \*26. Nor does the alleged conduct suggest that the United States was taking any affirmative steps to reunite the children with their rightful custodian. At this point, at least, the defendant has not shown the 31-day separation was justified. *Id.* (finding five days of separation unjustified).

However, Family C cannot proceed under this theory. Multiple courts, even when returning verdicts favorable to similarly situated plaintiffs, have found that after a non-citizen parent has been detained and the children are separated, the children become UACs. *See, e.g.*, *id.* at ––––, 2022 WL 1912254 at \*26 (holding that *after* a noncitizen father was released, his child was no longer a UAC); *Maldonado*, 2018 WL 2089348, at \*5 n. 6. Even though the TVPRA does not *mandate* family separation, as discussed above in the DCE analysis, it does not *forbid* family separation, at least after the government has taken some separate action against a parent and there is no available non-detained parent in the country. Because the TVPRA does not forbid family separation in these instances, Family C cannot point to it to satisfy the first prong of the DFE analysis.

### ii. The DFE and the *Flores* Settlement and the Handbook

Similar problems affect the plaintiffs' arguments about the *Flores* settlement and the CPB Policy Manual. A district court has held that non-citizen parents have a constitutional right to be detained with their children and a right (from the *Flores* settlement) for their children to be released from detention under certain circumstances, but it is the parents' prerogative, not the government's, to choose which right to exercise. *Flores v. Sessions*, No. 85-cv-4544-DMG, 2018 WL 4945000, at \*4 (C.D. Cal. July 9, 2018). However persuasive that Court's reasoning, it does not stand for the proposition that the *Flores* settlement forbids family separation—it stands for the proposition that the *constitution* forbids it, as discussed below.

**\*8** Furthermore, while the *Flores* settlement contains generic statements about the safety of minors and "least restrictive settings," that is not specific enough to mandate or forbid activity under this prong of the DFE analysis. Similarly, the CPB policy manuals instructions to "maintain family unity to the greatest extent possible" fails to specify a course of action such that it is not discretionary. Also, in general, references to manuals and other informal sources of policy as authority are disfavored. *Reyes-Colón*, 974 F.3d at 60-61. This is especially true where the agency in question

uses statutes and regulations. *Irving v. United States*, 162 F.3d 154, 165-66 (1st Cir. 1998) (en banc). Therefore, plaintiffs have failed to point to a statute, regulation or policy that shows the family separation was forbidden, at least for children without a non-detained parent in the country. Therefore, they have not met the first prong of the second step of the DFE analysis.

The second prong asks whether family separation was susceptible to a weighing of competing policy priorities. *Hajdusek*, 895 F.3d at 150. It does not matter if actual deliberation occurred and the Court does not look to the mental state of the officers. *Id.* And if this prong is reached there is a presumption in favor of the government. *Id.* But even if the decision was "nominally discretionary, [it] may pass a threshold of objective unreasonableness such that no reasonable observer would see [it] as susceptible to policy analysis." *Id.* at 152; *see also Davallou v. United States*, 998 F.3d 502, 505 (1st Cir. 2021). This is a case-specific, fact-specific inquiry. *Shanksy v. United States*, 164 F.3d 688, 693 (1st Cir. 1999).

Although decisions classifying and housing individuals detained by the United States government are normally susceptible to policy analysis. *Santana-Rosa v. United States*, 335 F.3d 39, 43-44 (1st Cir. 2003), the actions alleged pass the "threshold of objective unreasonableness such that no reasonable observer would see [it] as susceptible to policy analysis." *Hajdusek*, 895 F.3d at 152. Although neither the CPB Manual nor the *Flores* settlement are specific enough to establish a policy for the purposes of the first prong, they do establish settled, legitimate priorities. *Cf. id.* at 150-51. The manual is clear that only legal requirements, "or an articulable safety or security concern" can justify separation. And children are to be put in the "least restrictive setting." Here, the only conceivable reason for separating these families was "the *in terrorem* effect it may have on others." *D.J.C.V.*, ––– F.Supp.3d at ––––, 2022 WL 1912254, at *16. That is not a valid priority. Therefore, the conduct was not susceptible to policy analysis and the DFE does not apply to the conduct affecting Family C.

*iii. The DFE and Unconstitutional Actions*

Alternately, unconstitutional actions are not protected by the DFE, either in the First Circuit, *Limone v. United States*, 579 F.3d 79, 101-02 (1st Cir. 2009); *Thames Shipyard & Repair Co. v. United States*, 350 F.3d 247, 254 (1st Cir. 2003), or in most circuits, *Loumiet v. United States*, 828 F.3d 935, 943 (D.C. Cir. 2016) (collecting cases).

*A. The Constitutionality of Separating Noncitizen Families*

It is not enough to simply allege that the conduct was unconstitutional to bypass the DFE. Instead, the plaintiff must allege facts that would be sufficient to survive a 12(b)(6) motion if this Court were considering the conduct's constitutionality directly. *Cf. id.*; *Gill v. United States*, 516 F. Supp. 3d 64, 80-81 (D. Mass. 2021). Because the plaintiffs have the burden of establishing jurisdiction, they may not allege in conclusory terms that the conduct is unconstitutional. However, because the defendant does not contest any facts, this Court accepts all well-pleaded facts as true. *Cebollero-Bertran*, 4 F.4th at 69. Here, the allegations meet that standard.

*9 In *Aguilar v. ICE*, the First Circuit held that separating non-citizen families did not violate Substantive Due Process. 510 F.3d 1, 21-24 (1st Cir. 2007). In that case, a factory in Massachusetts had been raided by ICE agents and many of the workers, undocumented immigrants, were transported to Texas and detained apart from their families. *Id.* at 6. The First Circuit ruled that the action did not "shock the conscience" because ICE had attempted to coordinate with social services beforehand and had released several detainees for humanitarian reasons; the Court concluded that the harm was the result of "ham handed" implementation, not willful malice. *Id.* at 22-23. Here, the family separation policy was not "ham handed" incompetence; the plaintiffs have adequately alleged that it was intentional. This Court has no difficulty finding that separating families for "the *in terrorem* effect it may have on others" shocks the conscience. *D.J.C.V.*, ––– F.Supp.3d at ––––, 2022 WL 1912254, at *16.

As to the violation itself, the First Circuit in *Aguilar* recognized that there is a right to family integrity, but contrasted the "transitory" harm suffered by the separated families with the permanent harms recognized in case law. 510 F.3d at 23. However, the First Circuit noted that "[w]ere a substantial number of young children *knowingly*

*placed in harm's way*, it is easy to imagine how viable claims might lie." *Id.* at 22 (emphasis added).

This Court agrees with the court in *Ms. L v. ICE* that *Aguilar*'s hypothetical "narrow set of circumstances" was realized in these allegations. 302 F. Supp. 3d 1149, 1165 (S.D. Cal. 2018). Indeed, harming children was *the point* of this alleged conduct—to deter other families from crossing the southern border. Furthermore, unlike the plaintiffs in *Aguilar*, the separation was not an incident to an arrest; the parents and children here were detained together. *Id.* at 1162-64. This holding does not apply to the arrests or even the civil detention of parents generally —it applies to the separation of families who are detained together. Furthermore, it is only unconstitutional as applied to separations where both parents and children "are held in immigration detention [but not criminal detention] and when there has been no showing [that] the parent is unfit or poses a danger to the child." *Id.* at 1162.

This Court might hesitate to find a constitutional violation in an FTCA case if it was writing on a blank slate, especially in the realm of Substantive Due Process. *Cf. Aguilar*, 510 F.3d at 23-24. But multiple courts have found this conduct unconstitutional. *Ms. L.*, 302 F. Supp. 3d at 1162-65 (separating families in this way violates Due Process); *accord W.S.R. v. Sessions*, 318 F. Supp. 3d 1116, 1124-26 (N.D. Ill. 2018); *M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 118-21 (D.D.C. 2018); *see also A.I.I.L. v. Sessions*, No. CV-19-00481-TUC-JCH, 2022 WL 992543, at *3-*4 (D. Ariz. Mar. 31, 2022) (the DFE does not apply in a family separation FTCA case because the conduct was unconstitutional); *accord Nunez Eueda v. United States*, No. 2:20-cv-10793-VAP, 2021 WL 4895748, at *3 (C.D. Cal. Apr. 27, 2021); *D.J.C.V.*, ––– F.Supp.3d at –––– – ––––, 2022 WL 1912254, at *12-*17; *C.M. v. United States*, No. 19-cv-05217-PHX-SRB, 2020 WL 1698191, at *4 (D. Ariz. Mar. 30, 2020); *A.P.F. v. United States*, 492 F. Supp. 3d 989, 996-97 (D. Ariz. 2020). The Fourth Circuit has held that there is no "right to family unity in the context of immigration detention pending removal." *Reyna as next friend of J.F.G. v. Hott*, 921 F.3d 204, 210-11 (4th Cir. 2019). However, *Reyna* reads the constitutional right in an inappropriately narrow light and is inconsistent with *Aguilar*, so this Court declines to follow it.

Because the conduct in question was unconstitutional, the DFE does not apply.

### B. Qualified Immunity

Defendant argues that if conduct that violates the constitution is not covered by the DFE, the DFE will cease to be a meaningful barrier to tort liability in FTCA cases. Therefore, they suggest this Court import something like qualified immunity into FTCA cases. This is an open question in the First Circuit. *Cf. Soto-Cintron on behalf of A.S.M. v. United States*, 901 F.3d 29, 35 n. 4 (1st Cir. 2018). There is no basis for this proposed importation. Qualified immunity as applied to 42 U.S.C. § 1983 and other similar statutes is an exercise in statutory interpretation; namely, that Congress did not intend to displace common law immunities for state officers. *Pierson v. Ray*, 386 U.S. 547, 554-55, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). The decision to extend an identical immunity to federal officials in *Bivens* actions was an exercise in federal common law given that *Bivens* is court-made. *Butz v. Economou*, 438 U.S. 478, 503-04, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).

**\*10** The reasoning from *Butz* cannot be applied to the FTCA because the FTCA is a statute, not a court-made cause of action. The reasoning from *Pierson* is not applicable because the FTCA is a different statute than the one codified at 42 U.S.C. § 1983. Whereas § 1983 is silent as to immunities, Congress crafted specific "immunities" for federal officials in the FTCA, most importantly the DCE.[5] The DCE bars "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid." 28 U.S.C. § 2680(a). This plainly overlaps with qualified immunity, which bars suits on the basis of constitutional violations where the right in question is not "clearly established." *Penate v. Hanchett*, 944 F.3d 358, 366 (1st Cir. 2019). In some ways the DCE is broader than qualified immunity: the DCE shields the United States from FTCA liability that occurs when enforcing even obviously unconstitutional statutes or regulations (so long as

it is done with due care). But in other ways it is narrower: it does not include the implementation of *policies*. Congress chose what types of "immunities" would be available under the FTCA, and this Court "cannot 'enlarge' the FTCA "beyond such boundaries as its language plainly requires." " *Reyes-Colón*, 974 F.3d at 60 (citation omitted).

Furthermore, the reasoning of *Pierson* and its progeny is not applicable because the FTCA does not render individuals liable. The Supreme Court noted common law immunity developed from the sense that "public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). No officer is ever liable under the FTCA. This Court is not blind to the effects of FTCA suits. It is common sense that officers whose conduct is the subject of FTCA suits will often be involved in the litigation, but that inconvenience is qualitatively different from the personal liability an officer faces in a damages suit.

The defendant also asserts that the resulting asymmetry, where conduct that could not be the basis of a *Bivens* claim can be the basis of an FTCA claim, shows the statutory interpretation must be wrong. That an FTCA suit might be available when a *Bivens* action is not reflects that the FTCA and *Bivens* actions are "parallel, complementary causes of action," *Carlson v. Green*, 446 U.S. 14, 20, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), not a mistake in statutory interpretation.[6]

Finally, the government's fears of mass tort liability are overblown. If the government is enforcing a statute or regulation, it is shielded by the DCE even if the statute or regulation is blatantly unconstitutional, such that qualified immunity would not apply. Plaintiffs must allege a separate tort that results *from* the unconstitutional action; they may not recover from merely unconstitutional actions. *Limone*, 579 F.3d at 102 n. 13 (unconstitutionality defeats the DFE but does not supply the plaintiff with a basis for liability). For the plaintiff to proceed past the pleading stage they must allege unconstitutional actions that would pass a 12(b)(6) motion. Most importantly, this has been the law for decades and this Court is not aware of a flood of FTCA suits that followed the decision in *Limone*. This Court may not import an immunity scheme that frustrates the policy decisions implicit in the FTCA and which is not found in the text, history, or purpose of the statute. As such, it declines to import qualified immunity into the FTCA context.

### c. Private Person Analogue

The defendant argues there is no private person analogue for the plaintiffs' claims. The United States cannot avoid FTCA liability by arguing that the conduct is "unique" to the government; the question is whether there are "like circumstances" under which a private person would be liable. *United States v. Olson* 546 U.S. 43, 46-47, 126 S.Ct. 510, 163 L.Ed.2d 306 (2005). It is true that there is conduct that does not have *any* "like circumstances" for a private person. But these are things like a failure to perform regulatory functions, or a duty to investigate and report crimes. *Sea Air Shuttle Corp. v. United States*, 112 F.3d 532, 536-37 (1st Cir. 1997); *Gauthier v. United States*, No. 4:10-cv-40116-FDS, 2011 WL 3902770, at *10 (D. Mass. Sept. 2, 2011). In contrast, the conduct alleged—imprisoning and separating children from their parents—would lead to tort liability if done by private persons.

*11 In FTCA cases, the action is governed by the substantive tort law of the state in which the tortious act allegedly occurred. 28 U.S.C.A. § 1346(b)(1). From the facts in the complaint, the only jurisdictions whose laws could apply are the District of Columbia (all plaintiffs), Michigan (Family O), and Texas (all plaintiffs). Plaintiffs argue Texas law might not apply and Massachusetts law might apply, but do not explain why. Furthermore, it is not premature to review the law applied here merely because this is a putative class action. Most courts that have ruled in favor of similarly situated plaintiffs have conducted this step to ensure they have jurisdiction over the named plaintiffs. *D.J.C.V.*, ––– F.Supp.3d at –––– – ––––, 2022 WL 1912254, at *19-*22; *A.I.I.L.*, 2022 WL 992543, at *6-*8; *A.P.F.*, 492 F. Supp. 3d at 994-95; *C.M*, 2020 WL 1698191, at *2. Because the defendant did not file a motion to dismiss for failure to state a claim, the Court's analysis is restricted to identifying an analogous cause of action.

### i. Tortious Interference with Parent-Child Relationship

Texas does not recognize a general "tortious interference with familial relationships" cause of action, *Hardy v. Mitchell*, 195 S.W.3d 862, 864 (Tex. App. 2006); *see also Helena*

*Lab'ys Corp. v. Snyder*, 886 S.W.2d 767, 768 (Tex. 1994) (declining to recognize a "negligent interference with familial relationships" cause of action). But it does recognize a cause of action when children are abducted from their rightful custodian. *Silcott v. Oglesby*, 721 S.W.2d 290, 292-93 (Tex. 1986).[7] Michigan also allows claims for the wrongful abduction of children. *Brown v. Brown*, 338 Mich. 492, 498, 61 N.W.2d 656, 659 (1953). The District of Columbia has a similar cause of action. *Bennett v. Bennett*, 682 F.2d 1039, 1044 (D.C. Cir. 1982). Therefore, although it is not precisely the same label, a private analogue exists.

### ii. IIED and NIED

Texas allows IIED claims, but not NIED claims. *Twyman v. Twyman*, 855 S.W.2d 619, 621-24 (Tex. 1993). The Michigan Supreme Court has never recognized nor barred IIED claims. *Eaton Pine Vill. v. Jackson*, No. 224572, 2002 WL 1360397, at *5-*6 (Mich. Ct. App. June 21, 2002) (unpublished). However, such claims have been common in Michigan lower courts for decades and are de facto accepted. *Id.* at *6-*7. NIED claims are also functionally recognized. *Jensen v. Hadden*, No. 351591, 2020 WL 7417497, at *5 (Mich. Ct. App. Dec. 17, 2020) (unpublished). Finally, both IIED and NIED claims are recognized in the District of Columbia. *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1260-61 (D.C. 2016), *as amended* (Dec. 13, 2018) (applying IIED); *Jones v. Howard Univ., Inc.*, 589 A.2d 419, 422-23 (D.C. 1991) (adopting NIED); *see also Sibley v. St. Albans Sch.*, 134 A.3d 789, 797-98 (D.C. 2016) (applying NIED). Therefore, a private analogue exists for all plaintiffs at this stage of litigation.

### iii. Loss of Consortium

Texas and Michigan recognize children's loss of consortium claims in non-fatal cases. *Reagan v. Vaughn*, 804 S.W.2d 463, 465-67 (Tex. 1990); *Berger v. Weber*, 411 Mich. 1, 11-13, 303 N.W.2d 424, 424-26 (1981). There is no binding precedent from the District of Columbia barring or applying loss of consortium claims to children. However, federal courts in the District of Columbia have held the doctrine is not recognized locally. *Pleasant v. Wash. Sand & Gravel Co.*, 262 F.2d 471, 472-73 (D.C. Cir. 1958); *Hill v. Sibley Mem'l Hosp.*, 108 F. Supp. 739, 740-41 (D.D.C 1952). Recent District of Columbia precedent holds the loss of consortium doctrine is limited to claims where "the claimed injury is to the marriage itself," thus, such claims do not extend to the parent-child relationship. *Paxton v. Wash. Hosp. Ctr. Corp.*, 991 F. Supp. 2d 29, 32 (D.D.C. 2013) (citation omitted). Because Michigan and Texas law are likely applicable, there is a private-person analogue.

### iv. False Arrest / Imprisonment

*12 Texas allows false arrest and false imprisonment claims and other courts have considered those actionable in the immigration context in an FTCA action. *Lopez-Flores v. Ibarra*, No. 1:17-cv-00105, 2018 WL 6577955, *1, *3 (S.D. Tex., Mar. 12, 2018). Michigan recognizes a cause of action for false imprisonment. *See, e.g.*, *Adams v. Nat'l Bank of Detroit*, 444 Mich. 329, 336-38, 508 N.W.2d 464, 466 (1993) (discussing the elements of the tort). The District of Columbia allows false imprisonment claims, *see, e.g.*, *Doe v. Safeway, Inc.*, 88 A.3d 131, 132 (D.C. 2014), and false arrest claims, *see, e.g.*, *Jenkins v. District of Columbia*, 223 A.3d 884, 889-90 (D.C. 2020). Therefore, private person analogues exist.

### d. Assorted Matters

Plaintiffs raise assault and battery claims based on unlawful touching of the plaintiffs by immigration officers. Defendant tries to recast these as "conditions of confinement claim," but they are not. Defendant makes no attempt to argue these claims are covered by the DCE or DFE, and such allegations have obvious private person analogues in every jurisdiction. It would be premature to dismiss these claims at this point.

The defendant raises a novel theory that "systemic" torts are not allowed under the FTCA. Insofar as the defendant is referencing the requirement that the United States is only liable for the acts of specific officers, that requirement is largely met here, except for the general negligence claims discussed below.

Plaintiffs raise a claim of "negligent supervision." Insofar as the negligent supervision claims are based on the assault

and battery claims, they also must remain. But insofar as the plaintiffs are arguing that the *separation* was due to negligent supervision, the claim borders on incoherent because plaintiffs allege the separation was *ordered*. The only conceivable form of liability the plaintiffs could be alleging is one of negligence on the part of the United States in separating families. That is not cognizable under the FTCA. Therefore, insofar as the negligent supervision claims are based on the theory that the United States was generally negligent in allowing families to be separated, the claim fails for lack of subject matter jurisdiction.

For the reasons above, defendant's motion to transfer is ***denied***, and the alternate motion to dismiss is ***granted*** in part and ***denied*** in part. All claims brought by the parents in their personal capacities are dismissed. Any claim of negligent supervision or negligence in causing the family separation is dismissed. All other claims remain.

**SO ORDERED**.

**All Citations**

--- F.Supp.3d ----, 2023 WL 131411

**Conclusion**

**Footnotes**

1  **Count I**: Intentional Infliction of Emotional Distress (on behalf of all plaintiffs); **Count II**: Negligent Infliction of Emotional Distress (on behalf of all plaintiffs); **Count III**: False Imprisonment (on behalf of all plaintiffs except E.O. individually); **Count IV**: False Arrest (on behalf of all plaintiffs except E.O. individually); **Count V**: Assault and Battery (on behalf of all plaintiffs except E.O. individually); **Count VI**: Negligent Supervision (on behalf of all plaintiffs except E.O. individually); **Count VII**: Tortious Interference with Parent-Child Relationship (on behalf of all plaintiffs); **Count VIII**: Loss of consortium (on behalf of all plaintiffs).

2  The plaintiffs allege that Family O crossed near "McAllen, Texas" in their complaint; the briefing clarifies, correctly, that is in the Southern District of Texas. Courts may generally take judicial notice of geographic facts. *United States v. Bello*, 194 F.3d 18, 23-24 (1st Cir. 1999); *see also United States v. Moon*, 802 F.3d 135, 149 n. 11 (1st Cir. 2015).

3  Ease of access to documents is not normally considered in the digital age. *ViaTech Techs., Inc. v. Adobe Inc.*, No. 19-cv-11177-ADB, 2020 WL 1235470, *4 (D. Mass. Mar. 13, 2020).

4  Unlike in *Wadhams*, there is no contention that this Court lacks personal jurisdiction over the defendant. 2020 WL 3129480 at *2.

5  More accurately, Congress crafted exceptions to the general waiver of sovereign immunity by the United States, but those exceptions have a similar function to immunities in limiting liability.

6  Furthermore, given the limited applicability of *Bivens* actions, such asymmetry would be narrowly consigned. *See, e.g.*, *K.O. v. ICE*, 468 F. Supp. 3d 350, 363-67 (D.D.C. 2020) (finding that the conduct in this case does not give rise to a *Bivens* claim).

7  The Supreme Court of Texas technically applied the common law tort retrospectively in recognition that a since-repealed statutory cause of action would apply prospectively. In the absence of controlling precedent, this Court predicts that a tort for child abduction would be recognized in Texas.

**K.O. by and through E.O. v. United States, --- F.Supp.3d ---- (2023)**
Case 4:22-cv-05333-DMR   Document 28   Filed 01/19/23   Page 15 of 15
2023 WL 131411

---

**End of Document**                                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.